## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant,

v.

## SOUTHWESTERN BAPTIST THEOLOGICAL SEMINARY, Defendant-Appellee.

No. 80-1370.

United States Court of Appeals,
Fifth Circuit.
Unit A

July 17, 1981.

Melissa Langa, Lutz Alexander Prager, E.E.O.C., Washington, D.C., for plaintiff-appellant.

Garrett & Stahala, Steve M. King, J. Jenkins Garrett, Fort Worth, Tex., for defendant-appellee.

Lee Boothby, Berrien Springs, Mich., amicus curiae.

Before CHARLES CLARK and GEE, Circuit Judges, and SPEARS *, District Judge.

CHARLES CLARK, Circuit Judge:

This case requires us to balance the interest of the federal government in enforcing Title VII against the first amendment rights of a religious institution of higher learning. The Equal Employment Opportunity Commission (EEOC) appeals the judgment of the district court denying its efforts to compel submission of the Higher Education Staff Information Report (EEO-6). Following the standards set out in *E.E.O.C. v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980), we affirm in part, and, in part, reverse and remand. 485 F.Supp. 255.

## I. FACTS

### A. *The Seminary*

The Southwestern Baptist Theological Seminary (Seminary) is a Texas non-profit corporation located in Forth Worth, Texas.[1] According to the Seminary's bylaws, it is owned, operated, and controlled by the Southern Baptist Convention (Convention), a voluntary association of Southern Baptist churches, incorporated in Georgia. The Convention elects the Seminary's trustees, dictates its purpose, and provides sixty percent of its financial support. As announced by the Convention, the Seminary's objective is "to provide theological education, with the Bible as the center of the curriculum for God-called men and women to meet the need for trained leadership in the work of the churches." As described by Dr. Robert Naylor, President Emeritus of the Seminary, its relationship with local Southern Baptist churches is more functional than structural: "The churches are the source, of course, of the Seminary, provide its constituency and use its product." The Seminary offers degrees only in theology, religious education, and church music; the curriculum is not to be expanded to "provide strictly secular education," according to its bylaws. The Convention does not allow the Seminary to charge tuition.

The approximately 1450 seminarians must meet three requirements of admission beyond the ordinary academic standards. Each applicant must represent that he or she has received a divine appointment to Christian ministry, the spouse (if any) of each prospective student must express a conviction that the student has received such a "call," and the local church of which the candidate is a member must pass a resolution acknowledging his or her personal integrity and commitment to the Christian faith and recommending the individual for admission to the Seminary. Thus, no matter how superior one's academic ability is, religious commitment is the quality that determines admission.

The procedures and criteria governing the Seminary's employment decisions reflect the nature of the Seminary and are the part of the Seminary's operation with which the EEOC is concerned. The Seminary's employees may be divided into three main categories: faculty, administrative staff, and support personnel.

Article VI of the Seminary's bylaws begins: "It shall be the policy of the Seminary to strive for and maintain a faculty

---

* District Judge of the Western District of Texas, sitting by designation.

1. Our factual statements are drawn from the district court's findings of fact and from undisputed testimony heard by the district court.

composed of persons of unquestionable Christian character, positive and consecrated Christian attitudes, faithful allegiance to the Baptist faith, highest possible scholastic attainments and aptitude for teaching." According to Dr. Russell Dilday, who at the time of trial was the President of the Seminary, the order of criteria in this provision and in a policy statement entitled "Criteria for Evaluation of Faculty," adopted by the faculty in 1966, is not accidental: scholastic attainments are listed third because of "greater importance than that is the individual's personal characteristics, his relationship to the Lord, the church, and his activities within the denomination." Evidence of this nature caused the district court to find that: "Members of the faculty and administration of [the] seminary are considered ministers and are hired, assigned, advanced, tenured, evaluated and terminated on predominately religious criteria." And again, "Recruitment of faculty and administrators is viewed as a divinely guided 'spiritual quest' mutually pursued by the Seminary and the prospective employee."

The district court also found that the support personnel "perform a bona fide religious and educational function." Since ninety-five percent of these positions are filled by students and spouses of students and faculty, there is a built-in qualification for most of the support personnel. Undisputed testimony reveals that the remaining twenty-two full-time support personnel must be compatible with the "Seminary family," and must display an appreciation for and participation in the mission of the Seminary.

In sum, as found by the district court, the "Seminary regards its employment decisions as divinely guided assessments of each employee's suitability for the position he will occupy in relation to the students and as a representative of the institution . . . ."

B. *The Report*

Section 709(c) of Title VII of the Civil Rights Act of 1964, codified in 42 U.S.C. § 2000e–8(c), provides in part:

(c) Every employer, employment agency, and labor organization subject to this subchapter shall (1) make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed, (2) preserve such records for such periods, and (3) make such reports therefrom as the [EEOC] shall prescribe by regulation or order, after public hearing, as reasonable, necessary, or appropriate for the enforcement of this subchapter or the regulations or orders thereunder.

Pursuant to the authority of this section, the EEOC promulgated the following regulation:

On or before November 30, 1975, and biennially thereafter, every public and private institution of higher education having fifteen (15) or more employees shall file with the Commission or its delegate executed copies of Higher Education Staff Information Report EEO–6 in conformity with the directions set forth in the form and accompanying instructions. Every institution of higher education shall retain at all times, for a period of three years a copy of the most recently filed Report EEO–6 . . . .

29 C.F.R. § 1602.50 (1980).

Since the burden of filing this report is discussed herein, we shall briefly describe it. The report is denominated "Higher Education Staff Information (EEO–6)," and consists of six letter-size pages. It first requires an identification of the institution and any parent institution. The filing institution is required to indicate whether it has a contract with the federal government and the approximate dollar amount of any such contract.[2] The institution must reveal the general job description, length of employment contract, salary bracket, gender, and race or national origin of every employee. This information is not linked to the name of any specific employee, but is rather revealed by means of a complex chart. By

---

**2.** In addition to the EEOC, the form is made available to the Office of Federal Contract Compliance, Department of Labor, and the Office for Civil Rights, H.E.W. (now H.H.S.).

the same method, the tenure status of various faculty positions is correlated with the gender and race information of those who hold these positions. The number of "full time staff paid in full from 'soft money' sources" is to be indicated. The same information required regarding full-time, permanent employees also is required for temporary and part-time employees.

The Seminary refused to file EEO–6. The EEOC brought suit to compel compliance pursuant to 42 U.S.C. § 2000e–8(c). The district court, finding that the application of Title VII to any aspect of the employment relationship between the Seminary and its employees leads to excessive governmental entanglement with religion violative of the establishment clause and infringes the Seminary's rights under the free exercise clause of the first amendment, refused to compel the Seminary to file the EEO–6 forms.

## II. A SIMILAR CASE: *MISSISSIPPI COLLEGE*

This case is quite similar to *E.E.O.C. v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980). The parties assert and we recognize that there are three major areas of factual distinctions between this case and *Mississippi College*. The first concerns the nature of the institutions. We noted in *Mississippi College* that the "evidence presented to the district court makes it readily apparent that the character and purposes of the college are pervasively sectarian." *Id.* at 487. The character and purposes of the Seminary are wholly sectarian. This factual distinction is pertinent not only to the applicability of *Mississippi College*, but also to the test for excessive governmental entanglement. *See* Part III A, *infra.* The Seminary's role is vital to the Southern Baptist Church. No one would argue that excessive intrusion into the process of calling ministers to serve a local church is constitutionally permissible. The Convention's hiring of faculty and other personnel to train ministers for local churches is equally central to the religious mission and entitled to no less protection under the first amendment.

The second distinction is that the subpoena challenged in *Mississippi College* imposed a broader compliance burden than do the EEO–6 reports required here. The subpoena demanded a list of all staff showing name, race, sex, religion, job description, pay, and educational level. Information pertaining to faculty recruiting and promotions, and access to all applications for faculty and administrative positions during the period in issue were also required. *See id.* at 480 n. 3. The requirements of the EEO–6 report, set out above, reveal that the report compels much less detail than the subpoena. Unless the Seminary experiences frequent faculty turnover, the report is less burdensome though it must be filed every two years.

The final area of factual difference between this case and *Mississippi College* is the context in which the government's requests for information was made. In *Mississippi College*, a dissatisfied employee had filed a charge with the EEOC, alleging sex discrimination. The EEOC investigated the charge and issued the subpoena in the course of that investigation. *Id.* at 480. Here there is no charge of discrimination; the EEOC seeks merely to gather statistical information from educational institutions.

## III. CONSTRUCTION OF TITLE VII: *McCLURE*

The Seminary argues that Congress did not intend Title VII to apply to the employment relationship between a church and its ministers, citing *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972), and that *McClure's* holding applies to this case. Mrs. McClure brought suit under Title VII of the Civil Rights Act of 1964, claiming that the Salvation Army discriminated against her on account of her gender. The legal boundaries of this court's decision in *McClure* are apparent from the opening paragraphs: "The Salvation Army is a church and Mrs. Billie B. McClure is one of its ordained ministers .... Restricting our decision to the church-minister relationship and expressly refraining from any decision as to other church employees of a type not in-

volved in this controversy, we affirm the judgment rendered below." *Id.* at 554–555. To reach this result, the court found that the Salvation Army was an "employer engaged in an 'industry affecting commerce,'" within the meaning of § 701(b), (f), and (h) of Title VII, 42 U.S.C. § 2000e(b), (f), (h), but that the exemption found in § 702, 42 U.S.C. § 2000e–1, did not apply. *McClure*, 460 F.2d at 556–58. In addressing the constitutional issues presented, the court found that a serious doubt of constitutionality was raised and concluded that Congress did not intend to regulate the employment relationship between church and ministers. *Id.* at 558–561. The Supreme Court in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), used the same approach to statutory construction as this court did in *McClure*. In *Mississippi College* we determined that the College could not rely on *McClure's* ultimate holding, because the College was not a church, and its faculty and staff were not ministers. *Mississippi College*, 626 F.2d at 485.

The Seminary asserts its situation is factually distinct from the *Mississippi College* case because it is a church and its faculty and staff are ministers. While the Seminary does not contest that it meets the initial criteria for application of the statute, it argues that section 702 of Title VII exempts it from filing these forms. In this regard, the Seminary asks us to reconsider *McClure's* holding that section 702 does not exempt religious organizations from liability for discrimination based on race, color, sex, or natural origin. The Seminary urges that *Catholic Bishop* requires a modification of *McClure*. However, after both the announcement of *Catholic Bishop* and the filing of the Seminary's brief, this court has reaffirmed *McClure's* validity. *E.E.O.C. v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980). Thus, this holding of *McClure* may not be reexamined by this panel. Nevertheless, we still must compare the facts of *McClure* to those in this case to ensure that the constitutional considerations that mandated the *McClure* holding are equally efficacious here.

*McClure's* reasoning is grounded in a line of Supreme Court cases dealing with intra-church disputes. After discussing the "wall of separation" that exists between religion and the state, citing *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), and the need for a compelling interest to justify even an incidental burden, citing *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the court turned to those cases dealing with judicial consideration of matters of purely ecclesiastical concern. Finding that the "relationship between an organized church and its ministers is its lifeblood," the court held that the maintenance of a private Title VII suit by one such minister against the church would violate the principles embodied in the line of cases from *Watson v. Jones*, 13 Wall. 679, 80 U.S. 679, 20 L.Ed.666 (1871), through *Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). *McClure*, 460 F.2d at 558–60. Similarly, those principles would be violated by the EEOC's demand to reveal the details of the employment relationship between a church and its ministers.

While we agree with EEOC that the burden of filing the EEO–6 form is less than the burden of defending a lawsuit, its interest in acquiring information about such relationships is greatly attenuated. The EEOC has denied in this case that it is seeking to enforce any substantive provision of Title VII. It says it is simply gathering information in case Congress wants it. Congress' need for information in an area it cannot constitutionally regulate is not a compelling interest, and the EEOC does not argue that it is. The rationale of *McClure* is fully applicable here.

A. *Is the Seminary a "Church"?*

We come now to the crux of this case: the proper characterization of the Seminary. The EEOC describes the Seminary as a religiously affiliated institution. The Seminary claims it is wholly religious.

■ Since we have already distinguished *Mississippi College* on this issue, *see* Part II, *supra*, we turn to *McClure*. Our task in discerning the nature of the Seminary and the role of its employees is more difficult than that the court faced in *McClure*. There, all parties agreed that the Salvation Army was a religion and McClure was a minister, *id.* at 556. Clearly, the Seminary is an integral part of a church, essential to the paramount function of training ministers who will continue the faith. It is not intended to foster social or secular programs that may entertain the faithful or evangelize the unbelieving. Its purpose is to indoctrinate those who already believe, who have received a divine call, and who have expressed an intent to enter full-time ministry. The local congregation that regularly meets in a house of worship is not the only entity covered by our use of the word "church." That much is clear from *McClure*. In the Baptist denomination, the Convention is formed to serve all participating local congregations. The fact that those who choose to participate in the Convention do so voluntarily renders it no less deserving of the protection of *McClure*. Since the Seminary is principally supported and wholly controlled by the Convention for the avowed purpose of training ministers to serve the Baptist denomination, it too is entitled to the status of "church."

## B. *Who are the "Ministers"?*

This is a more difficult question. The parties have identified three categories of Seminary employees: faculty, administrative staff, and support staff. The district court concluded that the first two groups should be considered ministers, while the latter group were not "ministers in the formal sense." To the extent that these findings indicate determinations of fact by the district court, they must be accepted unless clearly erroneous. Fed.R.Civ.P. 52. The status of these employees as ministers for purposes of *McClure* remains a legal conclusion subject to plenary review. The Seminary urges that all its employees serve

a ministerial function. While religious organizations may designate persons as ministers for their religious purposes free from any governmental interference, bestowal of such a designation does not control their extra-religious legal status.

■ The district court found that the Seminary makes employment decisions regarding faculty members largely on religious criteria. This finding is supported by the record. As previously discussed, the level of personal religious commitment of faculty members is considered more important than their devotion to the Baptist church or their academic abilities, though all of these qualities are desirable. According to Dr. Dilday, President of the Seminary, there is no course taught at the Seminary that has a strictly secular purpose; Dr. Naylor, the Seminary's President Emeritus, testified similarly. Though the record indicates that ministers are ordained by local churches and not by the Seminary, most of the faculty have been ordained. The Seminary expects the faculty to teach by example as well as by other means.[3] The faculty models the ministerial role for the students. Based on the district court's findings of fact, we conclude that the faculty at the Seminary fit the definition of "ministers" for the purpose of applying *McClure*.

■ The facts in *Mississippi College* were not the same. There, we explained:

> The faculty members are not intermediaries between a church and its congregation. They neither attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine. That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern.

*Id.* at 485. In this case, the faculty are intermediaries between the Convention and the future ministers of many local Baptist churches. They do instruct the seminarians in the "whole of religious doctrine," and

---

**3.** This fact would not of itself be controlling. *See Mississippi College*, 626 F.2d at 485.

only religiously oriented courses are taught.[4] Thus, the role of the faculty of the Seminary is different from that of Mississippi College's faculty. "Candor compels acknowledgment, moreover, that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 755 (1971). The line, though dimly perceived, is there. *McClure* establishes that Title VII does not apply to the employment relationship between this Seminary and its faculty. Given the unique role of the faculty of any school, they are afforded unique protection. *See N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 500–502, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533, 541–42 (1979).

The support staff consists of approximately twenty-two full-time personnel and several hundred part-time personnel who perform a variety of non-academic functions. The part-time workers are almost exclusively students, spouses of students, or spouses of faculty. At least four of the full-time workers have been ordained in the Baptist denomination. By their own testimony, their calling is service in the maintenance department of the Seminary. Thus, we must determine whether under *McClure*, though one need not be ordained to be a minister as indicated previously, ordination is a sufficient factor to make one a minister. Our analysis is complicated by the fact that Mrs. McClure, though an ordained minister, was functioning principally as a secretary at the time she was discharged. The failure of any party to challenge Mrs. McClure's "status as a minister engaged in the religious or ecclesiastical activities of the church" relieved this court from clearly explicating the test for such a determination in that case. *See id.* at 556. Moreover, Mrs. McClure's status as an ordained minister, a commissioned officer in the Salvation Army, was neither incidental to nor depreciated by her service as a secretary. According to the district court's fact findings in *McClure*, commissioned officers may be assigned field duty, similar to a local pastorate, or staff duty, consisting of various assignments in one of the Army's regional headquarters. *McClure v. Salvation Army*, 323 F.Supp. 1100, 1101–02 (N.D.Ga.1971). Mrs. McClure's position as a secretary was the staff duty assigned to her. She was still fully qualified and authorized to perform the ceremonies of the Army, which, the district court found, included swearing in officers, conducting weddings and funerals, and dedicating babies. *Id.* at 1101, 1104. The role of the support staff at the Seminary is qualitatively different from Mrs. McClure's role in the Salvation Army.

■ The undisputed testimony of the Director of the Physical Plant, Mr. James R. Leitch, was that ordination was not a requirement for the positions held by the four ordained ministers. Unlike Officer McClure, these workers' ordination is not an integral part of their total vocation. These support personnel are not engaged in activities traditionally considered ecclesiastical or religious. Indeed, the district court found that they were not "ministers in the formal sense." We conclude they are not ministers in the *McClure* sense. The same analysis applies to the part-time staff. Though these workers are drawn from a restricted group, and though many of them are training to be ministers or to serve as spouses of ministers, the tasks they perform in these jobs are not of an ecclesiastical or religious nature. With respect to their employment relationship with the Seminary, these employees are not entitled to ministerial status under *McClure*.

■ Much of the reasoning applied to the faculty is pertinent to some of the administrative staff of the Seminary. The President and Executive Vice President of the Seminary, the chaplain, the deans of men and women, the academic deans, and those other personnel who equate to or su-

---

4. The record does not reveal whether the faculty members attend to students' religious needs when called upon to do so. The fact that many seminarians serve in various local churches as preachers, music ministers, or youth directors indicates that these fledgling ministers must look, if anywhere, to the faculty for religious guidance.

pervise faculty should be considered ministers as well. On the other hand, those administrators whose function relates exclusively to the Seminary's finance, maintenance, and other non-academic departments, though considered ministers by the Seminary, are not ministers as we used that label in *McClure.* Their positions are akin to support staff positions. When churches expand their operations beyond the traditional functions essential to the propagation of their doctrine, those employed to perform tasks which are not traditionally ecclesiastical or religious are not "ministers" of a "church" entitled to *McClure*-type protection. In the absence of exact job descriptions of all positions on the administrative staff, we are unable to be precise as to the category of all personnel. Should the parties be unable to agree as to whether any particular administrative staff position is traditionally ecclesiastical or ministerial, the resolution of the dispute may be referred to the district court.

## IV. FIRST AMENDMENT QUESTIONS

[redacted] The EEOC's regulation requiring form EEO–6 to be filed is the direct subject of the Seminary's challenge. However, since the EEOC's statutory authority to pass such a regulation is not attacked, our analysis focuses on the validity of the statute. Consideration of the constitutionality of the statute may be avoided altogether if its plain meaning avoids any constitutional problem. *See, e. g., St. Martin Evangelical Lutheran Church and Northwestern Lutheran Academy v. South Dakota,* — U.S. —, 101 S.Ct. 2142, 68 L.Ed.2d 612 (1981). If the interpretation complained of "presents a significant risk that the First Amendment will be infringed," any ambiguity in the statute is construed in a manner to avoid such constitutional problems. *N.L.R.B. v. Catholic Bishop of Chicago,* 440 U.S. 490, 502, 99 S.Ct. 1313, 1320, 59 L.Ed.2d 533, 542 (1979); *McClure v. Salvation Army,* 460 F.2d 553 (5th Cir. 1972). If no such doubts are raised, the interpretation complained of, which ofttimes is that adopted by an administrative agency charged with enforcing the statute, still must be subjected to thorough constitutional analysis. This "second look" is intended to ensure that constitutional issues receive the most careful consideration. *E.E.O.C. v. Mississippi College,* 626 F.2d 477, 485–89 (5th Cir. 1980). The obvious aim of this process is to avoid, if at all possible, ruling on the constitutionality of a statute. The reasons for this aversion to exercising judicial review over legislative acts have been explained many times by the Supreme Court. *See, e. g., Rescue Army v. Municipal Court,* 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947); *Ashwander v. TVA,* 297 U.S. 288, 345, 56 S.Ct. 466, 482, 80 L.Ed. 688, 709–710 (1936) (Brandeis, J., concurring).

As stated, the provisions of Title VII do not apply to the church-minister relationship. We continue the analysis now as to those employees of the Seminary that are not "ministers." The framework for this analysis is provided by *Mississippi College.* There, as here, the governmental involvement was challenged as violative of both the free exercise and establishment clauses. In our case, the district court found that application of the reporting requirements of Title VII to the Seminary would impair the Seminary's free exercise of religion and would foster an excessive governmental entanglement with religion. We shall discuss the two religion clauses separately.[5]

### A. *The Establishment Clause*

As we noted in *Mississippi College,* the Supreme Court has used a three-prong test

5. The precise challenge presented by this case falls between the two religion clauses and between the tests used under them. Though the Seminary complains of "entanglement," it does not argue that Congress is attempting to establish the Baptist or any other religion by enacting Title VII. Entanglement is a concept developed in and used most frequently in the context of establishment clause cases. On the other hand, the Seminary does not claim that the reporting requirements directly burden the exercise of any particular tenet of their faith—the test employed under the free exercise clause. There may come a time when administrative burdens placed upon a religion by a government will be so onerous as to warrant the employment of a new test. The traditional tests suffice in the context of this case.

to determine whether an act of Congress violates the establishment clause:[6] (1) whether the statute has a secular purpose, (2) whether its primary effect neither advances nor inhibits religion, and (3) whether it fosters " 'an excessive government entanglement with religion.' " *Id.* at 486, quoting *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 755 (1971). Here, as in *Mississippi College,* only the third part of the test is in dispute. *Lemon* explained the three factors to be evaluated in determining whether any entanglement is excessive: the character of the institution affected, the nature of the aid (or burden) provided, and the resulting relationship between church and state. *Lemon,* 403 U.S. at 614–15, 91 S.Ct. at 2112, 29 L.Ed.2d at 756–57.

We have already explained, in Parts I and II, *supra,* that the Seminary is wholly sectarian, an arm of the Southern Baptist Convention, owned and controlled by it.

The filing requirement is, of course, a burden rather than an aid to the Seminary. As in *Mississippi College,* the burden complained of here is largely hypothetical. Indeed, filing the form is less a real burden than was the subpoena required of *Mississippi College.* There has been no complaint of discrimination at the Seminary, and there is no particularized investigation into the Seminary's hiring practices. The only aspect of the EEOC's requirements in this case more demanding than those in *Mississippi College* is the biennial nature of the filing requirement. Though this requirement is "ongoing," it is not an "ongoing interference with the [Seminary's] religious practices . . . ." The resulting relationship between the Seminary and the government is consequently minimal. Thus, application of Title VII's reporting requirements to the Seminary's non-ministerial employees does

not violate the establishment clause. *See Mississippi College,* 626 F.2d at 488.

**B.  *The Free Exercise Clause***

The first amendment provides: "Congress shall make no law . . . prohibiting the free exercise" of religion. Again, our opinion in *Mississippi College* identifies a three-part test for constitutional violation:

(1) the magnitude of the statute's impact upon the exercise of the religious belief, (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief, and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.

*Id.* at 488, citing *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

Since the Seminary does not hold any religious tenet that requires discrimination on the basis of sex,[7] race, color, or national origin, the application of Title VII reporting requirements to it does not directly burden the exercise of any sincerely held religious belief.[8] In fact, the impact of the filing requirements is less than that of complying with the subpoena as in *Mississippi College.* So the first factor weighs against the Seminary's position.

Though the compelling interest of eliminating discrimination exists in this case as well as in *Mississippi College,* the necessary relationship between that interest and the means employed, obviously present in that case, is not so obviously present here. This is particularly true since the EEOC has disavowed any attempt to use these filing requirements to monitor compliance with Title VII. The EEOC maintains that the EEO–6 reports may be used to determine

**6.** "Congress shall make no law respecting an establishment of religion . . . ." U.S.Const. amend. I.

**7.** Dr. Naylor's testimony indicates that the Seminary may have a preference for males in some ministerial positions. *Cf. Mississippi College,* 626 F.2d 487.

**8.** As we explained in *Mississippi College,* "the relevant inquiry is not the impact of the statute upon the institution, but the impact of the statute upon the institution's exercise of its sincerely held religious beliefs." *Id.* at 488.

whether a charge filed in the future is deserving of action. But every datum in these reports could be learned by the exercise of the Commission's subpoena power once an investigation is initiated. While the enforcement of a subpoena in the context of an actual charge of discrimination is certainly vital to the enforcement of Title VII, the regular collection of information that could be obtained by other means when needed to enforce the law is not so vital. Thus, the weights on both sides of the scales are lighter than they were in *Mississippi College*. On the more delicate balance, even this governmental interest justifies the almost non-existent impact on the exercise of religious beliefs.

The final factor to be considered is whether and to what extent the governmental objectives would be impeded by granting an exemption from the reporting requirement. When we discussed this factor in *Mississippi College*, we considered the quantitative and qualitative impact of the college and similar institutions on society and concluded that although the number of such religious educational institutions is small, their impact on society is great because of their role in educating the next generation. If such an education is given in an atmosphere of discrimination, the result could seriously undermine our congressionally declared policy of eliminating discrimination. *Id.* at 489. In today's case, the possibility of undermining congressional policy is not as great as it was in *Mississippi College*. There are fewer institutions like the Seminary than there were like the College. More importantly, the qualitative impact of the Seminary on society in general is reduced because all students at the Seminary have expressed a desire to enter full-time religious service. Though some might think it desirable for local church ministers to espouse antidiscriminatory ideas, the government is surely prohibited from requiring or forbidding such actions. Further, as mentioned before, no one has charged that the Seminary discriminates in violation of Title VII. The dangers we discussed in *Mississippi College* are hypothetical here.

Finally, the EEOC represents the function of the EEO–6 form to be that of gathering information. Thus, the EEOC's direct "objective" could be said to be surveying employment in institutions of higher learning, not eliminating discrimination.

■ Though the scale is not heavily tipped in either direction, we conclude that an exemption for the Seminary's support staff and other non-ministers is not constitutionally compelled. Congress and the EEOC may seek the information in the EEO–6 report subject to the limitations we have discussed here and in *Mississippi College*.

Precedent does not compel the EEOC to refrain from requiring the Seminary to file the EEO–6 form as to their non-minister employees. Neither the Supreme Court nor this court has held that the employment relationship between a church and all of its employees is a matter of purely ecclesiastical concern.

The judgment of the district court is reversed in part and remanded for entry of judgment consistent with this opinion.

AFFIRMED IN PART, AND, IN PART REVERSED AND REMANDED.