The **ARCHBISHOP OF the ROMAN CATHOLIC APOSTOLIC ARCHDIOCESE OF SAN JUAN, His Eminence Luis Cardenal Aponte Martinez, et al., Plaintiffs,**

v.

**Miguel GUARDIOLA and Ferdinand Ferrer, et al., Defendants.**

Civ. No. 82–1289 HL.

United States District Court, D. Puerto Rico.

Dec. 16, 1985.

Jose Guillermo Vivas, Carlos Martinez Texidor, Jose Hector Vivas, Vivas & Martinez Texidor, Ponce, Puerto Rico, for plaintiffs.

Hector Reichard De Cardona, Sec. of Justice, E.L. Buso, Director Federal Litigation Div., Kathleen R. Guillermety, Atty., Federal Litigation Div., Dept. of Justice, San Juan, Puerto Rico, for defendants.

## OPINION AND ORDER

LAFFITTE, District Judge.

### I.

This action for declaratory judgment and injunctive relief was instituted by the hierarchy of the Roman Catholic Church responsible for its administration and management requesting that the Puerto Rico Minimum Wage Board be enjoined from establishing a minimum wage for the Church's lay employees and from investigating Church financial records for that purpose. Plaintiffs allege that application of the Puerto Rico Minimum Wage Act (the Act) to the lay employees of the Roman Catholic Apostolic Church and its organizations violates the Establishment and Free Exercise Clauses of the First Amendment of the Constitution of the United States of America, and seek declaratory action from this Court pursuant therewith.

The Minimum Wage Act of Puerto Rico, 29 L.P.R. Sections 245–246, creates the Minimum Wage Board, establishes its procedures, and recites the motivations for setting minimum wages.[1] The Act is a response to the existence of substandard wages, hours of work, and other working conditions which are detrimental to the health, efficiency and well being of workers, and the progressive development of the Puerto Rican economy, which represents a state of manifest social injustice, Section 245(a). The policy is to eliminate substandard working conditions, step up development, eliminate unfair competition, and achieve the highest possible wage level compatible with such development without substantially curtailing employment, Section 245(b). In order to accomplish this goal, minimum wages shall be revised every two years in each business, industry or occupation "until attaining, as rapidly as possible, a wage which is equal to the prevailing statutory minimum wage fixed in the Federal Fair Labor Standards Act," Section 245(c).

Charged with effecting this policy, the Minimum Wage Board has a duty to study and investigate economic and labor conditions in industry, Section 245b(a). Every employer has a duty to furnish the Board with all information available about wages, working hours, labor and financial conditions which the Board may consider pertinent, including payrolls, records of wages and hours of work, pay lists, assets and liability statements, profit and loss statements, and accounting books, Section 245d(a)(3). When the Board decides it is necessary to fix or revise a wage rate in any industry, it appoints a Minimum Wage Committee to draft a Mandatory Decree, Section 245i(a). The Board shall make available to the Committee all surveys, reports, statistics, and any other pertinent data for the proper discharge of its duties, Section 245j(c). In order to fix minimum wage rates, the Committee must conduct a public hearing so that all interested persons may participate in the promulgation of a decree by submitting pertinent data or

---

1. The Puerto Rico Minimum Wage Act closely followed the statutory scheme provided in the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq. The Minimum Wage Board is also empowered to establish working conditions, va- cations, and sick leave. For a comprehensive discussion of these bifurcated powers of the Board, see *Cerveceria Corona, Inc. v. M.W.B.*, 98 P.R.R. 784 (1970).

arguments. Subject to Board regulations, the Committee shall determine to what extent cumulative information may be received, Section 245j(b).[2]

The Board is empowered to define the industry over which the Minimum Wage Committee recommends the pertinent wage rates. Section 245J(a). In line with the foregoing, the Board promulgated Mandatory Decree No. 70, Fifth Revision (1978), applicable to the Miscellaneous Activities Industries. The industry is defined as follows:

"Article I—Definition of the Industry

This mandatory decree shall be applicable to all the employees of the Miscellaneous Activities Industry as defined below:

The Miscellaneous Activities Industry shall include the activities necessary or incidental to the support, operation or functioning of centers, enterprises, establishments or organizations such as those specified below, whether they are operated for profit or nonprofit purpose.

A. Social, Fraternal, Cultural, Religious, or Similar Organizations

Associations, professional colleges or institutions for social, cultural, scientific, religious, fraternal, charitable purposes or to stimulate or improve the conduct, interests, welfare or advancement of their members or affiliates; or nonprofit organizations such as professional, artistic, agricultural, industrial or commercial entities or fraternities, sororities, labor unions or political parties. All religious personnel invested with ecclesiastical faculties engaged in teaching or other religious or charitable activities is excluded. (Our emphasis.)

B. . . .

C. . . .

Article II—Minimum Wage

Every employer shall pay his employees a minimum wage per hour not lower than that provided hereinafter for the different classifications of the industry:

| Classifications and Occupations | Minimum Wage per Hour |
| --- | --- |
| 1. . . . | |
| 2. . . . | |
| 3. . . . | |
| 4. . . . | |
| 5. . . . | |
| 6. Religious Associations and Institutions Lay Employees * | |
|     a. Office Clerks | 2.50 |
|     b. All Other Workers | 2.40 [3] |
| 7. . . . | |
| 8. . . . | |
| 9. . . . | |

2. The Church does not challenge the statutory power of the Board to classify industries and obtain information pursuant to the statutory scheme. Rather, it asserts that application to the Church by the Board of its statutory powers violates the Religion Clauses of the First Amendment.

3. "Office Clerks" and "all other workers" were increased to $3.25 and $3.15 respectively by virtue of the Sixth Revision (1982) to Mandatory Decree No. 70.

| Classifications and Occupations | Minimum Wage per Hour |
| --- | --- |
| 10.  . . . | |
| 11.  . . . | |

\* These employees· shall not be covered by the minimum wage rates stipulated herein when they participate in ceremonies, liturgies or religious rituals."

On March 23, 1982, under the authority of the Act, defendants; the president and other officials of the Board, sent plaintiffs a letter and questionnaire to the various dioceses on the Island requesting certain financial data. The Church had been placed in the Miscellaneous Activities Industry, which is regulated by Mandatory Decree Number 70, fifth revision (1978). The information was requested so that the Board could prepare an economic study to help a soon-to-be-appointed Committee set a minimum wage rate in the industry. The Board seeks to compel disclosure of copies of the statement of income and expenses, including salaries of all employees, lay and religious, of the balance statement, including the value of such fixed assets as property, and of the payroll detailed by occupation.

Plaintiffs commenced this action for injunctive and declaratory relief in March 1983. The case is submitted on both parties' briefs and replies. All facts have been stipulated, and the matter is now ripe for disposition.

II.

Before considering possible violations of the Religion Clauses of the First Amendment it is necessary to consider whether the statutes grant jurisdiction over the Church, which argues it is not an industry within the meaning of the Act. Section 245(c) extends coverage, however, to industries, businesses, and occupations. The Puerto Rico Supreme Court has repeatedly held that the essential basis for fixing wages and defining industries "is the nature of the services rendered by the employee who performs them, no matter in what type of occupation the enterprise or employer employing him is engaged." *Secretary of Labor v. A.W.I., Inc.*, 97 P.R.R. 340 (1969); *Sierra Nuñez v. Construction Equipment Corporation*, 90 P.R.R. 136

(1964). Section 245o (a). This construction obtains especially because of the important social development aims of the statute. See also, *Secretary of Labor v. Cementerio Catolico Porta Coeli*, 92 P.R.R. 512 (1965); *Hospital San Jose, Inc. v. Minimum Wage Board*, 63 P.R.R. 717 (1944).

■ The Church cites *NLRB v. The Catholic Bishop Of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), for the principle that where there is a significant risk the First Amendment will be infringed, an "affirmative intention of Congress clearly expressed" is needed to include certain groups under coverage of a statute. Denying jurisdiction based on that holding depends, of course, on how one views the seriousness of the risk of infringing the First Amendment. As violation of the First Amendment determination is the central allegation brought by plaintiffs, it will be dealt with later in this opinion. In addition, the social development aims of the Act have jurisdictional ramifications not encountered in Catholic Bishop and the National Labor Relations Act. There the goal was industrial peace, which may or may not be advanced by recognizing lay teacher unions in secular schools. Here, it is to better the lot of workers in all covered occupations, which is being directly addressed by application of the Act to lay employees of the Church.

Minimum wages coverage has been held to extend to lay teachers, bus drivers, kitchen workers, and day care employees of church affiliated schools under the Fair Labor Standards Act, 29 U.S.C.A. 201 et seq. *Donovan v. Shenandoah Baptist Church*, 573 F.Supp. 320, 321 (W.D.Va. 1983), *Marshall v. First Baptist Church*, 23 BNA Wage and Hour Cases 386 (D.C.S.C.1977). The types of employees of the

Church covered by Mandatory Decree No. 70, such as janitors and office clerks, have similar duties.

◼ The Salvation Army was found to be an employer in an industry affecting commerce based on the magnitude of its operations—3,000 employees earning $7 million per year administering $147 million. *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.1972). The Catholic Church surely dwarfs the Salvation Army in terms of its size, its number of employees, its effect on commerce. Organizations affecting commerce may not escape the coverage of social legislation by showing they were created for fraternal or religious purposes. *Mitchell v. Pilgrim Holiness Church Corporation*, 210 F.2d 879 (7th Cir.1954).

◼ If lay employees of church-related schools are covered by FLSA, as in Shenandoah and First Baptist, we see no reason why lay employees of churches standing alone should not be likewise covered. Courts have often stated that schools are an integral instrument of a church's ideological function. *Lemon v. Kurtzman*, 403 U.S. 602, 92 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 172 (1975); *Surinach v. Pesquera De Busquets*, 604 F.2d 73 (1st Cir.1979). This "thorough religious permeation of the entire curriculum of parochial schools" is the reason forwarded for denying such government involvement as subsidies, *Meek, supra*, 421 U.S. at 368, 95 S.Ct. at 1765; *Lemon, supra*, 403 U.S. at 615, 91 S.Ct. at 2113, and NLRB jurisdiction, *Catholic Bishop of Chicago v. NLRB*, 559 F.2d 1112, 1122 (7th Cir.1977), for church-affiliated schools. The school is part of the church. It follows then that if certain employees of a church school are subject to minimum wage standards, so are employees in similar occupations working for the nonscholastic parts of the church. Both sets of employees are working for the church, and both sets are covered occupations. "There is no explicit exemption in FLSA for churches or church-related schools." *Donovan v. Central Baptist Church*, 25 BNA Wage and Hour Cases 815, 816 (S.D.Texas 1982).

III.

Having established the Minimum Wage Board's coverage over certain lay employees of churches, we must consider whether the manner or ends of imposing minimum wage standards infringes on First Amendment guarantees.

◼ The First Amendment specifies that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. Some aspects of religion are completely immune from state interference. The government may not compel or foster any creed or religious practice, *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961), and one has absolute freedom to hold any religious belief or opinion, *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). This does not mean, however, that churches remain completely free of government regulations. "The First Amendment ... does not say that in every and all respects there shall be a separation of Church and State." *Zorach v. Clauson*, 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952). Some relationship between church and state is inevitable. The line of separation is not a wall, but a blurred, indistinct, and variable barrier depending on the circumstances of the relationship. *Lemon, supra*, 403 U.S. at 614, 91 S.Ct. at 2112. Examples of legal restrictions on churches include fire inspections, building and zoning regulations, and compulsory school attendance standards. Id. *See, also, Gillete v. United States*, 401 U.S. 437, 462, 91 S.Ct. 828, 842–43, 28 L.Ed.2d 168 (1971) (denial of conscientious objector status when objection based on "unjust wars"); *Prince v. Massachusetts*, 321 U.S. 158, 168–69, 64 S.Ct. 438, 443, 88 L.Ed. 645 (1944) (protection of children from street proselytizers); *Jehovah's Witnesses v. King County Hospital*, 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed. 158 (1968) (per curiam), aff'd. 278 F.Supp. 488 (W.D.Wash. 1967) (override parents religiously motivat-

**1180**

ed decision to withhold blood transfusion necessary to save baby's life).

Having summarized the general constitutional principles, we now turn to the more particularized standards which have accreted over the years to test whether the Free Exercise and Establishment Clauses have been violated. Though these tests appear specific, application of them overlaps somewhat and is further complicated by separate consideration of the ends and means of the challenged statute.

■ Whether the Establishment Clause has been violated depends upon the application of a three-pronged test. First, the law must have a secular purpose. Second, its primary effect must not advance or inhibit religion. Third, its operation must not result in an excessive government entanglement with religion. *Lemon, supra,* 403 U.S. at 613, 91 S.Ct. at 2111.

■ The first two prongs are not troubling. The clearly expressed legislative intent of the Puerto Rico Minimum Wage Act is to better working conditions and aid development by securing a fair, uniform minimum wage for all workers. Any inhibition that could occur would be indirect and completely monetary, rather than ideological. Payment of a minimum wage is separable from religious practice. It is the third prong, excessive entanglement, that the Church maintains is involved in the Minimum Wage Board's decree. In determining excessive entanglement with religion the courts will examine the character of the affected institution, the nature of the burden, and the resulting relationship between church and state. Id. at 614, 91 S.Ct. at 2112.

■ One form of excessive entanglement to which the courts have been sensitive occurs when the administration of a statute involves the government in making extensive classifications of what is and what is not religious. *Lemon, supra,* at 620, 91 S.Ct. at 2114–15; *Walz v. Tax Commission of New York,* 397 U.S. 664, 698, 90 S.Ct. 1409, 1426, 25 L.Ed.2d 697 (1970); *Catholic Bishop, supra,* 559 F.2d at 1120. Fine attempts to distill nonsectarian functions from sectarian and ritualistic are to be avoided.

■ The operational character of the Church and the occupational emphasis of the challenged legislation combine to make classification a relatively simple matter. Janitors clean the premises, messengers deliver messages. Office clerks maintain records. Such identification does not involve the extensive, convoluted line drawing contemplated in the IRS attempting to determine which church functions are not religious for property tax purposes. *Walz, supra.* While church janitors clean articles and sites involved in religious ritual, and office clerks may help maintain membership records, as well as more strictly temporal, administrative and financial records, their connection with religious practice in the performance of the duties for which they are remunerated are so attenuated as to become detached given the job classification focus of the Act. These employees are support staff, engaged in administerial and maintenance functions. They are specifically distinguished from religious orders in Church Canons. They do not perform ceremonial or ritual work.[4] Janitors and clerks are engaged by the plaintiffs, so that plaintiffs may "properly carry out" plaintiffs' religious purposes, Stipulation 13. Plaintiffs retain control of all decision-making. The parish priest is responsible for maintaining sacramental records, Canon 470, Section 1,[5] while "all those concerned"

---

4. Paragraph 15 of the Stipulation of Facts of the parties provides in relevant part: "Defendants are enforcing and applying, and will continue to enforce and apply Minimum Wage Decree Number 70 upon the Roman Catholic Apostolic Church and its various organizations described in this stipulation such as janitors, clean up men and women, maintenance employees, messengers, office clerks, secretaries, social workers, and other employees who perform the nonceremonial or nonritual work for the said church and its various organizations."

5. *Canon 470.* Section 1. The parish priest must keep the following records (books): one for baptisms, one for confirmations, one for marriages and deaths; he should also endeavor to keep with great care, whenever possible, a

should strive to keep churches clean, Canon 1178.[6] Employment of janitors, clerks, secretaries, and other nonritual lay employees is a concession to the mundane, bureaucratic world in which the church must function. Government regulation of certain aspects of that world through state police power and social legislation is necessary for society to exist in collective safety and well-being. We therefore feel that the imposition of minimum wage rates to lay employees of the Church does not affect the religious facet of the Catholic Church. *Universidad Central De Bayamon v. N.L.R.B.*, 778 F.2d 906 (1st Cir.1985).

▆▆▆▆▆ Another aspect of entanglement the state must avoid is becoming involved in a continuing surveillance to an impermissible degree in order to maintain the separation between church and state. *Walz, supra*, 397 U.S. at 675, 90 S.Ct. at 1414; *Lemon, supra*, 403 U.S. at 616, 91 S.Ct. at 2114. Courts have been wary of schemes with "self perpetuating and expanding propensities," *Surinach, supra*, at 78. The ease and assuredness with which the religious/nonreligious distinction may be made in this case ensures the state will not become excessively entangled with the day-to-day operations of the church. As far as requiring the payroll records of covered lay employees, and using them to impose and ensure compliance with minimum wage standards, the Board runs no risk of transgressing the well defined line into religious functions.

The situation presented in *Surinach* would have involved the state, imbued with ongoing, ill-defined powers, in the school accounting process in order to ensure compliance with its orders aimed at controlling the spiralling cost of private (including church) education. In the subsidy cases, *Lemon, Meek, supra*, state funded teacher salaries for secular subjects, instructional

equipment and materials loans, and certain state provided remedial services have all been struck down due to the continuing entanglement that would be occasioned by the state surveillance necessary to ensure they were not used for religious purposes. Even such facially neutral things as movie projectors could foster religion if they were used to show religious films.

On the other hand, textbook loans to private sectarian schools have been generally upheld. *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed. 1060 (1968). One can easily determine based on their content whether textbooks are religious. *Meek, supra*, 95 S.Ct. at 1761. Whereas math teachers may deliver religious instruction, math books, per se, cannot. The positions of the occupations of janitors, office clerks, and secretaries, in relation to religion, their duties, what they get paid for, are more closely analogous to math books than math teachers. Cleaning and filing are just that, and cannot be accorded a religious function except as a kind of devotion. Attempts to broaden the term "religious order" to include all employees of all church operations have failed the test of "economic reality" and been rejected on factual grounds. *Tony and Susan Alamo Foundation v. Secretary Of Labor*, —— U.S. ——, 105 S.Ct. 1953, 1961, 85 L.Ed.2d 278 (1985); *Shenandoah, supra*, at 323.

▆▆▆▆ Because of the ease and assuredness with which the religious/nonreligious distinction may be made in this case and the resulting lack of a need for a high degree of state surveillance, the payroll records of covered lay employees should be made accessible to the Board. Perusing these records to ensure compliance is a straightforward, simple task, noticeably devoid of self-expanding propensities and religious practice entanglement. Some type of

---

record (book) related to the state of souls; and should record and keep all these records (books) diligently, pursuant to the use approved by the Church or prescribed by his own Bishop.

**6.** *Canon 1178.* All those concerned should strive for the maintenance of the cleanliness in

the churches as is becoming to the house of God, to keep away from the same the traffic and markets, even though held for a pious purpose, and in general, everything that is not in accord with the sanctity of the place.

job description, in order to determine coverage under the statute, perhaps includable in the payroll record, is also proper. *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277, 287 (5th Cir. 1981). *See also, EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir.1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981). Since the Church has already compiled payroll records, Stipulation 9, requiring it to make them available to the Board does not impose a significantly greater burden on church administration, *Alamo, supra*, 105 S.Ct. at 1964.

■ The Archbishop argues, and this Court agrees, that separate constitutional concerns obtain in the collection of financial data by the Board and in the purpose for such collection, imposition of minimum wage standards. *Surinach, supra* at 75 declared such a bifurcation artificial and constitutionally unsound, unless the power to regulate is conceded. There the court could not conceive "of any rational end product use of this information which will not encroach on appellant's First Amendment rights." If the imposition of minimum wage standards itself then does not necessarily violate the First Amendment, this Court may proceed with a bifurcated analysis. In *Pacific Union Conference of Seventh Day Adventists v. Marshall*, 434 U.S. 1305, 1309, 98 S.Ct. 2, 5, 54 L.Ed.2d 17 (1977) the Court rejected that church's objection to the government's discovery request to examine payrolls to determine applicability of the equal pay section of the FLSA, saying the full record must be compiled before review on the merits of the constitutional issue is possible. Collection of limited data—job descriptions, employment contracts, salaries, gender and race of employees—was sanctioned in *Southwestern Baptist* as a means of determining to which employees the statute was applicable.

The analysis in this case has proceeded along this path. Limited records have been allowed to determine that the Board has jurisdiction over the Church. The power to require payment of minimum wages to lay employees of the Church does not violate the Establishment Clause of the First Amendment as an excessive entanglement with religion. Turning down the second of the bifurcated paths, it is necessary to subject the Board's request to investigate other financial records, not directly related to ensuring compliance, to the same scrutiny.

The Board has requested that it be permitted access to the Church's records of balance statements, income and expense statements, and salaries of non-religious. The Board seeks these records, not needed for the imposition of minimum wages, pursuant to the procedures detailed in the Act for revising and setting industry-specific wage rates. Requiring submission of detailed information about the financial structure of the Church has the "self-perpetuating and self-expanding propensities" which trigger a greater risk of an unconstitutional degree of entanglement. *Surinach, supra*, at 78. This information, in the hands of the government, would be subject to public perusal, and possible governmental entanglement in administration other than ensuring compliance with minimum wage rates. Compelled production of the entire financial universe of the Church thus violates the First Amendment.

■ The Church also alleges a general violation of the Free Exercise Clause of the First Amendment. In determining whether a neutrally based statute violates the Free Exercise Clause the test consists of 1) the impact on the exercise of religious belief, 2) the compellingness of the state interest, and 3) the extent exemption from coverage would impede state objectives. *EEOC v. Mississippi College*, 626 F.2d 477, 488 (5th Cir.1980).

The impact on exercise of religious belief was considered in *Catholic Bishop of Chicago, supra*, 559 F.2d at 1123. Lay teachers protected by the NLRA could claim the right to take pro-abortion stances as a term or condition of employment. This would impede the Bishop's ecclesiastical authority to direct Church dogma. Personnel decisions would be chilled. *Surinach, supra*, at 77 held similar impediments to exercise

of religious belief exist in state regulated allocation and curriculum decisions. A church-affiliated school has the right to spend as much of its money as it chooses on religious subjects or religious aspects of nonsectarian subjects.

Here no such danger exists. The dogmatic aspects of the Church are left untouched. The only effect on Church administration and religious decisions would be indirect. The Church might have to dismiss some employees and curtail its activities if forced to pay minimum wage, Stipulation # 17. The Court of Appeals in *Alamo v. Secretary Of Labor*, 722 F.2d 397, ruled this to be no direct restraint on the freedom to worship. Moreover, the Church itself believes in paying its workmen a "decorous and fair salary", Canon 1524.[7]

Not all burdens on churches are unconstitutional. Many examples were listed earlier. The state may justify a burden on religious liberty by showing an overriding governmental interest. *Wisconsin v. Yoder*, 406 U.S. 205, 220–21, 92 S.Ct. 1526, 1535–36, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner*, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963). The social development aims of the Minimum Wage Act fall into this category. The high unemployment in Puerto Rico, the lower standard of living and lower minimum wage rate than on the mainland, make protection of workers more crucial. The size of the Catholic Church, its high number of lay employees not engaged in religious activity, make exemption of it from this legislation a significant impediment to compelling state social objectives. On the other hand, blanketly exempting churches from having to pay minimum wages may constitute special treatment in violation of neutrality principles. *See* U.Pitt.L.R. 465 (1979). The second prong of the test for violation of the Establishment Clause prohibits advancement, as well as inhibition of religion.

## IV.

In addition to justifying a burden on the free exercise of, or threatened entanglement with religion by showing a compelling state interest, the Commonwealth must show there exists a no less restrictive or entangling alternative. *Sherbert v. Verner, supra,* at 407, 83 S.Ct. 1790; *Walz, supra,* 397 U.S. at 674–75, 90 S.Ct. 1409. This the Commonwealth has not done. A less entangling alternative would be to require only payroll records of covered employees in order to ensure compliance, which we have held does not violate the Establishment Clause of the First Amendment.

While the statutory framework empowers the Board to collect other data such as balance sheets, income and expenses, and salaries, as well as impose minimum wage rates, the First Amendment precludes exercise of certain of these powers. *See Shenandoah v. Pesquera De Busquets, supra.* Limited application does not violate the principle of separation of church and state. In *EEOC v. Southwestern, supra,* the arguments and ruling were limited to the Equal Pay provisions of FLSA. The selective and bifurcated powers of the Minimum Wage Board of Puerto Rico were affirmed in *Cerveceria Corona, Inc. v. M.W.B.,* 98 P.R.R. 784 (1970), where it was ruled that the Board retained the power to determine which classes of employees in an industry were and which were not subject to those parts of a Mandatory Decree concerning vacations and sick leave.

Compelling the Church to produce balance statements, statements of income and expenses, salaries paid to religious personnel, depreciation of lots and buildings and other equipment, creates the likelihood of entanglement that the First Amendment proscribes.

Accordingly, plaintiff's motion for injunctive and declaratory relief is denied in part

---

**7.** Canon 1524 provides in pertinent part: "All, and especially the clergymen, the religious and the administrators of ecclesiastical goods, must assign to their workmen in their work contract a decorous and fair salary;..."

and granted in part. The compelled production of wage rates for lay employees of the Roman Catholic Church to the Minimum Wage Board of Puerto Rico and the enforcement of minimum wage rates on and by the same parties, is declared constitutionally sound. The compelled production of the other requested documents and data constitutes an excessive entanglement with religion and as such violates the Establishment Clause of the First Amendment of the Constitution of the United States of America, and is hereby enjoined.

The Clerk shall enter judgment in line with the foregoing.

IT IS SO ORDERED.