**Lee Ann BRYCE and the Reverend Sara D. Smith, Plaintiffs,**

v.

**EPISCOPAL CHURCH IN THE DIOCESE OF COLORADO, Saint Aidan's Episcopal Church, the Right Reverend William Jerry Winterrowd, in his official capacity and as an individual, the Reverend Tina Anderson, in her official capacity and as an individual, the Reverend Donald Henderson, in his official capacity and as an individual, the Reverend Neysa Ellgren, in her official capacity and as an individual, and Members of the Vestry of Saint Aidan's Episcopal Church, Karla Allen, Tracy Enholm, David Huff, Marti Ingram, Ed Kase, Margie Miller, Andy Morris, Bal Patterson, Virginia Patterson, Norm Pilgrim, Carol Rasmussen, Carol Stott, Mary Wilder, and Richard Wolniewice, in their official capacities and as individuals, Defendants.**

No. CIV. A. 00–WY–1216–C.

United States District Court,
D. Colorado.

Nov. 15, 2000.

Patricia S. Bangert, Powers & Phillips, PC, Denver, CO, for Plaintiff.

Samuel Martin Ventola, Rothgerber, Johnson & Lyons, LLP, Denver, L. Martin Nussbaum, Rothgerber, Appel, Powers & Johnson, Colorado Springs, CO, for Defendants.

## ORDER

BRIMMER, District Judge.

Plaintiffs bring this action against Defendants for alleged civil rights violations under 42 U.S.C. §§ 2000e, 1985(3), and 1986. The matter is presently before the Court on Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction. For reasons stated herein, this motion is converted to one for summary judgment and is disposed of pursuant to Fed. R.Civ.P. 56. After reading the briefs, hearing oral arguments, and being fully advised of the premises, the Court FINDS and ORDERS as follows:

### Statement of Parties and Jurisdiction

Plaintiffs are both residents of the State of Colorado. Defendants Episcopal Church in the Diocese of Colorado ("Diocese") and Saint Aidan's Episcopal Church ("St. Aidan's") are non-profit, religious corporations located in Colorado. All other Defendants, at all times relevant to this action, are residents of the State of Colorado. Plaintiffs assert this Court's jurisdiction under 28 U.S.C. § 1331, 42 U.S.C. § 2000e–5(f)(3), and 42 U.S.C. §§ 1985 and 1986.

### Background

The following facts are undisputed unless otherwise indicated:

Defendant St. Aidan's is a parish within the Diocese of Colorado. At all times relevant to this action, St. Aidan's was headed by Defendant Reverend Henderson, the Rector of the Church. The Rector is assisted in the administration of the parish by a body known as the "Vestry." The highest official of the Diocese is Defendant Bishop Winterrowd.

The Diocese has declared that youth ministry is one of its three main priorities. In accordance with the Diocese's position, St. Aidan's began to focus its efforts on enhancing its own youth ministry. Defendant Wilder headed St. Aidan's Youth Commission and created a Youth Minister Proposal ("Proposal"). Emphasizing the importance of a youth ministry, the Proposal declared:

> Youth are some of the most important people in the church. They are not only the church's future, they are its present. In our Fall Gatherings ... one theme that consistently arose as being central to our mission and one of our greatest needs was a strong and healthy program for youth. Parents have echoed this concern for years and we have a difficult time as a parish attracting and keeping families with children because of the lack of focus on youth in this parish. This issue directly affects our health as a parish, our growth according to the Great Commission, and our ability to carry out our Baptismal Covenant.
>
> . . . .
>
> ... [W]e, the church, must support parental and school efforts and to remind [the youth] of what needs to be central to their lives——JESUS as Lord of their lives.
>
> We, the church, can give our youth this identity as children of God.
>
> . . . .
>
> ... But, what we need to accomplish our mission is a part-time paid Youth Minister.

(Defs.' Br. in Supp. of Mot. to Dismiss Ex. 9; Youth Minister Proposal at 1–2.) The Proposal further stated that the "Youth Minister will direct a program aimed at implementing the mission statement of the Youth Commission." (*Id.* at 2.) "That program will claim Jesus as Lord ... and ... will seek to incorporate fellowship, edu-

cation, service and worship." (*Id.*) The Proposal described the duties of the Youth Minister to include: attending all Youth Commission meetings, and "working ... as a liaison with other ... ministries within the church to further the goals of the youth program." (*Id.*) St. Aidan's did not require that the Youth Minister be a member of the Episcopal Church, but did require that the Youth Minister have "[a] belief that Jesus is Lord and an ability to share that with youth in a constructive and non-oppressive manner." (*Id.*) The Proposal also required that the Youth Minister possess administrative and planning skills.

In June 1997, upon submission of the Proposal, St. Aidan's created a part-time paid position of Youth Minister. Plaintiff Bryce interviewed for the position in July 1997. In applying for the position, Plaintiff Bryce represented that she had "[o]ver 10 years experience in church leadership" (Pls.' Resp. to Defs.' Mot. to Dismiss Ex. H; Bryce Resume) and that she "felt pulled to combine [her] love of young people with [her] program ·development skills ... in the church setting which has meant so much to [her] life." (Defs.' Br. in Supp. of Mot. to Dismiss Ex. 14; Aidan Comfort,[1] Sept. 1997.) Plaintiff Bryce represented to the Youth Commission that she was called and gifted by God to minister to youth. (Defs.' Br. in Supp. of Mot. to Dismiss Ex. 2; Ellgren Aff. ¶ 3.) After interviewing Plaintiff Bryce, the Youth Commission was satisfied that she had a true Christian faith and the requisite administrative and planning skills. St. Aidan's thereafter offered the Youth Minister position to Plaintiff Bryce and she accepted the offer.

In August 1997, Plaintiff Bryce met with Defendant Wilder to discuss logistical aspects of the new Youth Minister position. Plaintiff Bryce set office hours whereby she would be "available for meetings with youth, parishioners, staff, etc." (Pls.' Resp. to Defs.' Mot. to Dismiss Ex. L; Meeting Notes ¶ 1.) Plaintiff Bryce also

agreed to attend the monthly meetings of the Youth Board. An initial "kick off" and a meeting with parents were planned so Plaintiff Bryce could "gain [parent's] input in developing the youth ministry." (*Id.*) Plaintiff Bryce also agreed to encourage the youth and their families to attend upcoming retreats and youth conventions. Finally, the meeting outlined plans for some recreational activities.

Plaintiff Bryce began working for St. Aidan's as the Youth Minister on September 1, 1997. While working for St. Aidan's Plaintiff Bryce was never a member of, nor ordained in the Episcopal Church. In September 1997, Plaintiff Bryce was the subject of a newsletter which quoted her as saying "[t]hroughout my secular career, I have found tremendous joy in my part-time employment as music and choir director in Texas and Arizona churches" and "I am excited about the possibility of ministering to youth in the Boulder Episcopalian community." (Aidan Comfort, Sept. 1997.)

In December 1997, Plaintiff Bryce and St. Aidan's youth group joined St. Aidan's Choir in "A Festival of Lessons and Carols" in which the youth group performed scripture readings. (Pls.' Resp. to Defs.' Mot. to Dismiss Ex. N at 3.) Plaintiff Bryce engaged in various other activities with the youth, including leading the youth in representing St. Aidan's in a march to benefit hunger as well as movie nights, miniature golf and other recreational and service activities. Plaintiff Bryce described some of these events:

> The highlight [of the month] was our first youth mission trip to Navajoland ... [where] our youth ... represented our parish and our Lord so beautifully.

(Pls.' Resp. to Defs.' Mot. to Dismiss Ex. N; Aidan Comfort, March 1998); and

> In April [1998] we began our current project of visiting other churches, some with traditions similar to ours and oth-

---

1. Aidan Comfort is a monthly newsletter distributed by St. Aidan's to its parishioners.

ers whose worship experience is quite different from our own. (*Id.*) Plaintiff Bryce admits that one of her functions as Youth Minister was to "build community" with the youth of the parish and that she acted as a "liaison" between the youth and other parish ministries and activities. (Defs.' Br. in Supp. of Mot. to Dismiss Ex. 8; Bryce Dep. at 51, 118.) She also acknowledges that it was her job to "[lead] the kids to the church door" and introduce them to the church and its activities. (Pls.' Resp. to Defs.' Mot. to Dismiss at 24.)

In August 1998, Plaintiff Bryce received a performance appraisal in which Defendant Henderson commented that Bryce was "[i]nspirational to youth and loves youth; ministers to parents as well as youth." (Pls.' Resp. to Defs.' Mot. to Dismiss Ex. K; Perf. Appraisal.) In the same appraisal, Defendant Henderson commented that one area in which Bryce needed further development was "expand[ing] outreach to other parish youth." (*Id.*)

In September 1998, Plaintiff Bryce began combining the youth's activities with the regularly scheduled parish meetings: "Middle schoolers will meet weekly on Sunday mornings for 10:00 Eucharist" and "High schoolers will meet monthly for 5:00 Eucharist." (Pls.' Resp. to Defs.' Mot. to Dismiss Ex. N; Aidan Comfort, Sept. 1998.) In her 1998 annual report, Plaintiff Bryce commented on the past year's activities and concluded that 1998 had been a "blessed year for the youth," saying:

> For the first time, middle school youth from St. Aidan's were a part of the contingent to Navajoland .... Our kids worked hard all week—rising early to cook, then preparing for evening Christian education activities, and concluding each day interacting with Navajo people in evening worship.
>
> This past October marked the first Youth Sunday, which will be held on a quarterly basis. Youth participated in many aspects of the service including providing special music, and serving as lay readers, acolytes, and ushers.

....

> A HUGE thanks to [Defendant] Mary Wilder ... your ... encouragement for our youth is greatly appreciated, as well as your vision for what the youth program at St. Aidan's could be....

(Pls.' Resp. to Defs.' Mot. to Dismiss Ex. N; Annual Report, Jan. 1999) (emphasis in original).

On one occasion, Plaintiff Bryce wrote a letter to the Vestry explaining "I have also enjoyed significant spiritual growth and a tremendous sense of purpose as I have ministered to the youth of this parish." (Defs.' Br. in Supp. of Mot. to Dismiss Ex. 29; Letter to Vestry, Jan. 9, 1999.) Plaintiff Bryce described her activities with the youth saying, "[w]e play, do community service projects, visit other churches, talk about the things going on in their lives, and we talk about God." (Defs.' Br. in Supp. of Mot. to Dismiss Ex. 43; Comments to St. Aidan's Congregation.) At least occasionally, Plaintiff led the youth group in prayer before meals or after their meetings.

On November 21, 1998, Plaintiff Bryce had a commitment ceremony with her partner and co-Plaintiff Reverend Sara Smith. This ceremony was held at the United Church of Christ where Plaintiff Smith is an ordained minister. Plaintiff Smith was not affiliated or associated with St. Aidan's or the Diocese in any manner.

This ceremony violated Episcopal doctrine embodied in the Lambeth Resolution. This Resolution is the result of a meeting held every ten years by the bishops from the worldwide Anglican communions which gather in Lambeth, England. The Lambeth Resolution provides:

> This Conference ...
>
> b) in view of the teaching of Scripture, upholds faithfulness in marriage between a man and a woman in lifelong union, and believes that abstinence is right for those who are not called to marriage;

c) recognizes that there are among us persons who experience themselves as having a homosexual orientation. Many of these are members of the Church ... and we commit ourselves to listen to the experience of homosexual people. We wish to assure them that they are loved by God and that all baptized, believing and faithful persons, regardless of sexual orientation, are full members of the Body of Christ;

d) while rejecting homosexual practice as incompatible with Scripture, calls on all our people to minister pastorally and sensitively to all irrespective of sexual orientation and to condemn irrational fear of homosexuals ....

e) cannot advise the legitimizing or blessing of same-sex unions, nor the ordination of those involved in such unions; ...

(Pls.' Resp. to Defs.' Mot. to Dismiss Ex. R; Lambeth Resolution.)

Plaintiff Bryce met with Defendant Henderson on November 30, 1998 to inform him of the commitment ceremony. In January 1999, Plaintiff Bryce met with Defendants Henderson, Ellgren, and Wilder. At this meeting, Plaintiff Bryce was informed that she would be terminated as Youth Minister in June 1999 because she was violating Episcopal doctrine to be married and faithful or single and celibate. Defendant Henderson proposed that Plaintiff Bryce could work with Defendant Ellgren as Co–Youth Ministers, but only until June 1999 and that Plaintiff Bryce could take a position as Adult Christian Education Coordinator and Assistant Music Director until the end of the year 1999, after which she would be terminated from employment at St. Aidan's.

During the month of January, Defendant Henderson took several actions in an attempt to deal with this situation. Defendant Henderson sent a letter dated January 4, 1999 to members of the Vestry and other leaders of St. Aidan's in which Defendant Henderson warned the Vestry of the divisive nature of the situation and attached materials addressing the church's position on homosexuality. The letter outlined Defendant Henderson's proposal to Plaintiff Bryce described above and also said that "[Plaintiff Bryce] states that she is a lesbian and that she chooses to live in a sexual relationship with [Defendant] Smith." (Defs.' Br. in Supp. of Mot. to Dismiss Ex. 26; Letter of January 4, 1999 at 1.)

On January 11, 1999, the Vestry met but took no action on the issue of Plaintiff Bryce's employment. Instead, they postponed their action until the parents and youth could have a chance to talk with Defendant Henderson and the Vestry.

On January 15, 1999, Defendant Henderson sent a confidential memorandum to Defendants Winterrowd and Anderson whereby he relayed the above information regarding the January 11 Vestry meeting. He also updated Defendants Winterrowd and Anderson on the situation with Plaintiff Bryce and noted the potentially explosive upcoming annual meeting and a meeting scheduled with parents and youth. In the January 15 memorandum there is no mention of Plaintiff Bryce, but only a reference to the dilemma that her situation presented.

Also dated January 15, 1999, is a confidential memorandum from Defendant Henderson to the members of the Vestry. Defendant Henderson explained his concerns regarding the youth and his conviction to follow the Lambeth Resolution. In this memorandum, Defendant Henderson admonished the members of the Vestry to keep these matters confidential.

On February 9, 1999, another Vestry meeting was held. A confidential memorandum memorializing the events of that meeting reveals that a decision was made to host four parish meetings to discuss this issue. The Vestry also decided to form a committee to begin searching for a new Youth Minister to begin work in September 1999. The memorandum emphasizes that Defendant Winterrowd has been in-

volved in this process, but that he is not trying to push Plaintiff Bryce out of the church.

In a letter dated February 18, 1999, Defendant Henderson again wrote to the Vestry and described his proposed compromise with Plaintiff Bryce as well as a proposed format for the parish meetings. The letter revealed that Plaintiff Bryce and Defendant Henderson had met on February 12, 1999 to discuss Defendant Henderson's proposal. An additional document dated February 18, 1999, directed to the members of the Vestry, outlined careful instructions on how to conduct telephone invitations for the parish meetings. The document instructed the caller to communicate that there was a situation regarding the Youth Minister and that she was "in a relationship that is outside the core teaching of our church about marriage." (Defs.' Br. in Supp. of Mot. to Dismiss Ex. 38; Notes to Vestry, Feb. 18, 1999.) Only members of St. Aidan's were selected to receive these telephonic invitations.

In late February 1999, St. Aidan's held a series of meetings to discuss this issue with the parish. A handout and a copy of the Lambeth Resolution was distributed at the parish meetings. The handout started by saying "St. Aidan's Youth Minister has entered a relationship that is outside the Episcopal Church's core teaching about marriage." (Pls.' Resp. to Defs.' Mot. to Dismiss Ex. R; Purpose of Parish Meetings.) It further stated that the Rector was attempting to reach a compromise which allowed him to be faithful to the Bishop and the Lambeth Resolution, but also to the youth, the Youth Minister and St. Aidan's. The handout asserted that the meetings were being held to strengthen parish communications and that all statements should be as positive and affirming as possible. Finally, it admonished the parishioners to keep all discussions confidential within the parish.

These meetings were conducted by professional facilitators. Plaintiff Smith attended the meetings, her presence was apparently requested by Defendant Henderson in order to provide support for Plaintiff Bryce. As it turned out, an overwhelming majority of those who spoke at the meeting supported Plaintiffs' position. During the meetings, Plaintiff Bryce expressed her views of the importance of these discussions:

> Although I do not consider my personal life to be fodder for conversation at my place of employment, perhaps it would be helpful and fitting to share some of it with you now.
>
> . . . .
>
> Some people say that it is not sinful to be a homosexual, but that it is sinful to engage in a homosexual relationship. This thinking is flawed for if it is really ok to be gay, then it would not be wrong to engage in a healthy, committed relationship. . . . Few people are called to celibacy—God gives us all desires for companionship, intimacy, for someone to share joys and sorrow with—to grow old with. I am no different. And I am blessed to have found someone like [Plaintiff Smith].
>
> . . . .
>
> . . . Perhaps the people of St. Aidan's need to decide what kind of church it wants to be—what it wants to be known for [regarding its openness to homosexuals].
>
> . . . .
>
> St. Aidan's is truly a microcosm of the church at large. The issue of homosexuality and inclusivity are at the forefront of every major denomination and threaten to tear the church apart. I am gravely concerned about the future of the church. I want to scream out—We CANNOT continue to act in ways that are bigoted, intolerant, unloving, unChristlike—because of teachings that are based on centuries of misunderstanding and prejudice.

(Defs.' Br. in Supp. of Mot. to Dismiss Ex. 42; Comments to St. Aidan's Congregation, Feb. 25–28, 1999) (emphasis in original). The parish meetings addressed gen-

eral issues of homosexuality and the church, as well as Plaintiff Bryce's future at St. Aidan's and her relationship with Plaintiff Smith. Plaintiff remained as St. Aidan's Youth Minister until June 1999 when her termination became effective.

Based on the foregoing events, Plaintiff Bryce alleges three causes of action: (1) Violation of Title VII of the Civil Rights Act of 1964 by Defendants Diocese, Winterrowd, Saint Aidan's, and Henderson whose actions constituted sexual harassment under 42 U.S.C. § 2000e, *et seq.*; (2) Violation of 42 U.S.C. § 1985(3) by all Defendants whose actions deprived Plaintiff Bryce of various constitutional rights and was motivated by their discriminatory attitude toward homosexual people and members of the United Church of Christ; and (3) Violation of 42 U.S.C. § 1986 by all Defendants resulting from Defendants' failure to prevent the actions alleged in Claim "2". Plaintiff Smith alleges two claims which mirror Plaintiff Bryce's second and third claims.

Defendants filed a motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), contending that Plaintiffs' claims are barred by the First Amendment right of church autonomy. Plaintiffs assert that this Court may hear their claims without violating the principles of the First Amendment. Both parties have submitted extensive materials beyond the pleadings in support of their positions.[2]

### Standard of Review

#### A. Facial Attack vs. Factual Challenge

██ Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take two forms: a facial attack or a factual challenge. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir.1995). A facial attack questions the sufficiency of the complaint

while a factual challenge contests the facts upon which the subject matter depends. *Id.* at 1002–03. When considering a facial attack, a court "must accept the allegations of the complaint as true." *Id.* at 1003. However, when considering a factual challenge, a court "may not presume the truthfulness of the complaint's factual allegations." *Id.*

Here, Plaintiffs bring suit under various federal civil rights laws and Defendants contend the Court is barred from hearing these issues by the right of church autonomy arising from the First Amendment of the United States Constitution. Defendants' therefore do not attack the sufficiency of Plaintiffs' complaint but rather challenge the facts upon which the complaint is based. As a result, this Court may not presume as true the allegations contained in the complaint. *Id.*

#### B. Conversion of 12(b)(1) motion to Rule 56(c) motion

██ When considering a factual challenge under Rule 12(b)(1), "[a] court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Id.* "In such instances, a court's references to evidence outside the pleadings does not convert the motion to a Rule 56 motion." *Id.* In fact, conversion of a Rule 12(b)(1) motion is generally not allowed unless the "jurisdictional question is intertwined with the merits of the case." *Wheeler v. Hurdman*, 825 F.2d 257, 259 (10th Cir.1987). If the two issues are intertwined, the court is required to convert the Rule 12(b)(1) motion into either a Rule 12(b)(6) motion or a Rule 56 motion for summary judgment. *Holt*, 46 F.3d at 1003; *see also United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1159–60 (10th Cir.1999) (finding that because the jurisdictional question

---

**2.** In addition to lengthy briefs, the parties have attached numerous affidavits and supporting evidence. In its supporting brief, Defendants attached forty-nine exhibits; Plaintiffs' response brief contained twenty-eight

exhibits; Defendants' reply was accompanied by another twelve exhibits; Plaintiffs' surreply contained several attachments, a Second Affidavit of Lee Ann Bryce, and two more exhibits.

was intertwined with the merits and because the district court considered affidavits and other evidentiary materials, the motion to dismiss should have been treated as a motion for summary judgment under Rule 56(c)).

Here, the Court must decide whether the jurisdictional question is intertwined with the merits of Plaintiffs' case. While intertwining is commonly found where the jurisdictional issue and the substantive claim arise from the same statute, *see Wheeler*, 825 F.2d at 259, the crucial inquiry is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim. *Pringle v. U.S.*, 208 F.3d 1220, 1223 (10th Cir.2000) (quoting *Wheeler*, 825 F.2d 257).

In *Tippett v. United States,* the 10th Circuit Court of Appeals faced the question of whether a claim under the Federal Tort Claims Act ("FTCA") intertwined jurisdictional questions with the merits of the case. 108 F.3d 1194 (10th Cir.1997). Under the FTCA, the United States waives its sovereign immunity with respect to certain types of claims, but retains immunity for claims resulting from discretionary functions ("Discretionary Function Exception"). *Id.* at 1196. "If the Discretionary Function Exception applies to the challenged governmental conduct, the United States retains its sovereign immunity, and the district court lacks subject matter jurisdiction to hear the suit." *Id.*

Intertwining was easily found in *Tippett* because the jurisdictional and substantive issues arose from the same statute, the FTCA. A more difficult case arises when the jurisdictional questions arise from a different source of law than the cause of action. For example, in *Pringle,* the court found intertwining where the jurisdictional issue arose from a judicially created immunity doctrine while the case was brought under the FTCA. 208 F.3d 1220, 1223. The court made its finding based on the fact that the Supreme Court derived the judicially created immunity doctrine as part of its statutory construction of the FTCA. *Id.* The court noted that the fact

that the jurisdictional question arises from a court promulgated rule, rather than enacted as part of the statute giving rise to the substantive claim is not dispositive of the conversion issue. *Id.*

■ In this case, the jurisdictional question requires this Court to decide whether the right of church autonomy grounded in the First Amendment bars Plaintiffs' claims. The merits of this case will require the Court to decide whether in fact Defendants violated Plaintiffs' civil rights. In Title VII cases, the right of church autonomy manifests itself in the form of the "Ministerial Exception" which exempts from judicial review the employment relationship between a church and its minister. *See McClure v. Salvation Army,* 460 F.2d 553, 560 (5th Cir.1972) (finding that application of Title VII to the employment relationship between a church and its minister would violate the principles of the First Amendment). In *McClure,* the court affirmed the district court's dismissal for lack of jurisdiction and held that Congress did not intend for Title VII to regulate the employment relationship between a church and its minister. 460 F.2d at 560–61.

Here, as in *Tippett,* if the Ministerial Exception applies, Plaintiffs' claims under Title VII are barred by the First Amendment and this Court lacks subject matter jurisdiction over the case. Further, as *Pringle* notes, the fact that Defendants' asserted Ministerial Exception is based on a judicially created immunity doctrine, while Plaintiffs' claims are rooted in the Civil Rights Acts, does not preclude this Court from finding that the jurisdictional and substantive issues are intertwined. *See Pringle,* 208 F.3d at 1223 (recognizing that this fact is not dispositive of the conversion issue). This is especially true when here, as in *Pringle,* the court promulgated Ministerial Exception was derived as part of the courts' statutory construction of Title VII. *See McClure,* 460 F.2d at 560–61. Therefore this Court finds that the jurisdictional issues and merits of Plaintiffs' case are intertwined.

Accordingly, as announced during the Court's September 12 motion hearing and because the parties have had ample opportunity to submit materials beyond the pleadings, Defendants' Rule 12(b)(1) motion to dismiss is converted to a Rule 56 motion for summary judgment.

### C. Burden of proof under converted motion

If the court converts a Rule 12(b)(1) motion to dismiss to a Rule 56(c) motion for summary judgment, the party invoking federal jurisdiction bears the burden of proving that subject matter jurisdiction exists. *Marcus v. Kansas Dep't of Revenue*, 170 F.3d 1305, 1309 (10th Cir.1999) (quotations and citations omitted). Federal courts are courts of limited jurisdiction, therefore a court presumes no subject matter jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction. *Spectrum Emergency Care, Inc.*, 190 F.3d at 1160 (citation omitted). "If jurisdiction is challenged, the burden is on the party claiming jurisdiction to show it by a preponderance of the evidence." *Id.* Mere conclusory allegations of jurisdiction are not enough, an assertion of subject matter jurisdiction must be supported with competent proof. *Id.* Since Plaintiffs are invoking this Court's subject matter jurisdiction, they bear the burden of proving it by a preponderance of the evidence.

### D. Standard of review for summary judgment

The Court's usual standard for motions of summary judgment applies to this converted motion. "Summary judgment is appropriate if the pleadings and other documents submitted before the court 'show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir.1998) (quoting Fed. R.Civ.P. 56(c)). When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *See Baptiste v. J.C. Penney Co., Inc.*, 147 F.3d 1252, 1255 (10th Cir.1998). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and a 'genuine' issue exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Occusafe, Inc. v. EG&G Rocky Flats, Inc.*, 54 F.3d 618, 621 (10th Cir.1995) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

### *Analysis*

### A. Plaintiff Bryce's Title VII Claims

#### 1. Policy of withholding judicial consideration

The Supreme Court of the United States has long held that civil courts are not the proper forum to decide matters of ecclesiastical concern. In *Watson v. Jones*, the Court recognized the "unquestioned" right to organize religious associations, to disseminate religious doctrine, and to create tribunals which decide controversies over questions of faith within the association. 80 U.S. (13 Wall.) 679, 728–29, 20 L.Ed. 666 (1871) (refusing to intervene in a property dispute between two factions of a church). The Court stated "it would be vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed." *Id.* at 729. The *Watson* Court further noted, "[i]t is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for." *Id.*

In *Gonzalez*, the Court affirmed the *Watson* principle saying, "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made

them so by contract or otherwise." *Gonzalez v. Roman Catholic Archbishop*, 280 U.S. 1, 16, 50 S.Ct. 5, 74 L.Ed. 131 (1929) (noting that the decision of whether to appoint a Chaplain is a canonical act exempt from judicial review).

The Court later converted the principle of *Watson* to a constitutional rule,

The opinion [in *Watson v. Jones* ] radiates ... a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference.

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952) (declaring unconstitutional a New York statute which had the effect of displacing one church administrator with another). The Court has further affirmed this result noting that civil courts have "no role in determining ecclesiastical questions in the process of resolving property disputes." *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 447, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (finding it improper for a Georgia state court to resolve a doctrinal controversy in the process of adjudicating a property dispute). "First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Presbyterian Church*, 393 U.S. at 449, 89 S.Ct. 601.

The lesson of the *Watson* line of cases is that the First Amendment severely limits the role civil courts play in resolving disputes within a church. Additionally, the *Watson* rationale is not confined to property disputes, but also applies to civil rights

cases arising from disputes between religious institution and its ministers. "This principle [of requiring civil court to refrain from deciding religious doctrinal disputes] applies with equal force to church disputes over church polity and church administration." *Serbian Eastern Orthodox Diocese for United States of America and Canada v. Milivojevich*, 426 U.S. 696, 710, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (applying the *Watson* rule to a Bishop's defrockment).

### 2. Application of Church Autonomy principles to civil rights legislation

The Fifth Circuit was the first to reflect on the Supreme Court's rationale in the *Watson* line of cases and decide that a minister could not maintain a suit against a church under Title VII. *See McClure*, 460 F.2d at 560 (finding that the "application of the provisions of Title VII to the employment relationship existing between the Salvation Army and Mrs. McClure, a church and its minister, would result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment"). The Fifth Circuit's opinion in *McClure* established what has become known as the "Ministerial Exception" to Title VII employment discrimination cases.

■ The Ministerial Exception applies the reasoning of the *Watson* line of cases to employment discrimination claims brought under Title VII of the Civil Rights Act of 1964. In keeping with the Supreme Court's caution against encroachment by the State into areas of church administration or selection of clergy, *Kedroff* 344 U.S. at 107–08, 73 S.Ct. 143, the Ministerial Exception precludes civil courts from adjudicating employment discrimination suits between ministers and the church employing them. *EEOC v. Catholic University of America*, 83 F.3d 455, 461 (D.C.Cir.1996).

Although the courts in this circuit have not had occasion to address the Ministerial Exception,[3] several other circuits have ap-

---

**3.** In *Powell v. Stafford,* District Judge Babcock

examined an employment discrimination case

plied the Ministerial Exception to bar Title VII claims. *See EEOC v. Roman Catholic Diocese,* 213 F.3d 795, 800 (4th Cir.2000) (recognizing that the Ministerial Exception is the "well-settled law of [the Fourth] circuit, [and] is widely recognized by other courts of appeals" and affirming the district courts dismissal of a music minister's Title VII gender discrimination claims); *Young v. Northern Illinois Conference of United Methodist Church,* 21 F.3d 184 (7th Cir.1994) (affirming the dismissal of a probationary minister's Title VII claims of race discrimination, sex discrimination, and retaliation); *Bollard v. California Province of the Soc'y of Jesus,* 196 F.3d 940, 948 (9th Cir.1999) (recognizing the existence of the Ministerial Exception); *Gellington v. Christian Methodist Episcopal Church, Inc.,* 203 F.3d 1299, 1304 (11th Cir.2000) (affirming dismissal of a minister's Title VII claims); *Catholic University,* 83 F.3d at 461 (finding that the Ministerial Exception barred a nun's Title VII sex discrimination claims).

The Ministerial Exception is not limited to ordained clergy. *See Catholic University,* 83 F.3d at 461. Application of the Ministerial Exception does not depend on ordination but upon the function of the position. *Rayburn v. General Conference of Seventh-Day Adventists,* 772 F.2d 1164, 1168–69 (4th Cir.1985) (holding that district court correctly granted summary judgment in Title VII case brought by a non-ordained woman who was denied a pastoral position because her suit was barred by the Ministerial Exception); *see also EEOC v. Southwestern Baptist Theological Seminary,* 651 F.2d 277, 283 (5th Cir.1981) (Title VII claims of non-ordained faculty at Baptist seminary barred by Ministerial Exception).[4] The Ministerial Ex-

ception has been extended to "lay employees of religious institutions 'whose primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order or participation in religious ritual and worship.'" *Catholic University,* 83 F.3d at 461 (quoting *Rayburn,* 772 F.2d at 1169). "This approach necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church." *Rayburn,* 772 F.2d at 1169.

Some, including Plaintiffs, attack the Ministerial Exception saying that the Supreme Court's decision in *Employment Div., Dep't of Human Resources v. Smith* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) sets a new standard for applying civil laws to religious organizations. In *Smith,* the Supreme Court addressed the issue of "whether the Free Exercise Clause ... permit[ted] the State of Oregon to include religiously inspired peyote use within the reach of its general criminal prohibition on use of that drug." 494 U.S. at 874, 110 S.Ct. 1595. The Court found that the Establishment Clause did not require Oregon to permit the religious use of peyote and that a law that burdens religious practice need not be justified by a compelling governmental interest if it is neutral and of general applicability. *Id.* at 879, 110 S.Ct. 1595.

Plaintiff contends that civil rights laws are laws of general applicability and therefore a court can apply them to religious organizations without transgressing the boundaries of the First Amendment. However, many courts have held, and this Court believes, that the Ministerial Exception survives the Supreme Court's decision in *Smith. See Roman Catholic Diocese,*

---

brought under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* 859 F.Supp. 1343 (D.Colo. 1994). There Judge Babcock held that the "ADEA"'s application ... would violate the Free Exercise and Establishment Clauses of the First Amendment. *Id.* at 1345. Judge Babcock stated that "[t]he First Amendment precludes judicial resolution of employment decisions involving ministerial employees."

*Id.* at 1346. While the court did not adopt the phrase "Ministerial Exception" in connection with ADEA cases, the analysis is similar to that used by other courts who have applied the Ministerial Exception to Title VII cases.

4. In the context of the ADEA, Judge Babcock found the claims of a lay theology teacher barred by the First Amendment. *Powell,* 859 F.Supp. at 1346–47.

213 F.3d at 800 n. 1 (noting that "[a]ll circuits to have addressed the question have recognized the continuing vitality of the [Ministry] Exception after the Supreme Court's decision in [*Smith* ]").[5] The D.C. Circuit rejected the argument that the Ministerial Exception failed to survive *Smith* by saying:

> First, the burden on free exercise that is addressed by the Ministerial Exception is of a fundamentally different character from that at issue in *Smith* .... The Ministerial Exception is not invoked to protect the freedom of an individual to observe a particular command or practice of his church. Rather, it is designed to protect the freedom of the church to select those who will carry out its religious mission....
>
> Second, while it is true that some of the cases that have invoked the Ministerial Exception have cited the compelling interest test ... all of them rely on a long line of Supreme Court cases that affirm the fundamental right of churches to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine ....

*Catholic Univ.*, 83 F.3d at 462 (quotations and citations omitted). This Court agrees with the D.C. Circuit and finds that the Ministerial Exception survives the Supreme Court's holding in *Smith.*

■ In sum, the Court finds the Ministerial Exception to be congruent with the Supreme Court's determination that the First Amendment limits a court's ability to meddle with a church's affairs, including its relations with its ministers. Therefore the Ministerial Exception ought to be applied to bar certain civil rights claims brought by a minister. Furthermore, whether an individual is a minister under the Ministerial Exception does not depend on ordination, but rather upon the function of the position. An individual may qualify as a minister under the Ministerial Exception if his or her position is important to the spiritual and pastoral mission of the church. In light of this legal landscape, the Court now turns to the circumstances presented in this case.

### 3. Application of the Ministerial Exception to Plaintiff Bryce's Title VII claims

Plaintiff Bryce's Title VII claim alleges that Defendants Henderson, Winterrowd, Diocese, and St. Aidan's subjected her to sexual harassment based on public statements which characterized homosexual activities in a harassing and humiliating manner. To determine whether the Court has jurisdiction over this issue, it must decide whether the claim arises from an employment relationship between a church and its minister. If so, Plaintiff's claims are barred by the Ministerial Exception. *McClure*, 460 F.2d at 560–61.

The Court first notes that the designation of Plaintiff Bryce's position as Youth Minister does not control the Court's analysis of whether Plaintiff Bryce was actually a "minister" under the Ministerial Exception analysis. *See Southwestern Baptist*, 651 F.2d at 283. The touchstone is whether the function of Plaintiff's position was important to the spiritual and pastoral mission of the church. *Rayburn*, 772 F.2d at 1169.

In order to determine whether Plaintiff functioned as a minister, the Court will address other cases that have examined the issue. In *Southwestern Baptist*, the court analyzed whether certain employees of a seminary were "ministers" for purposes of the Ministerial Exception. 651 F.2d at 283 (affirming the district court's finding that faculty were "ministers"). Regarding faculty members, the court found that the seminary made employment decisions based upon religious criteria. *Id.* The faculty members' level of personal

---

5. The Fourth Circuit cited the following cases as upholding the Ministerial Exception after the decision in *Smith*: *Gellington*, 203 F.3d at 1302–04; *Combs v. Central Tex. Annual Conference of the United Methodist Church*, 173 F.3d 343, 347–50 (5th Cir.1999); *Catholic Univ.*, 83 F.3d 455, 461–63 (D.C.Cir.1996).

religious commitment was considered more important than their devotion to the Baptist church. *Id.*

Regarding other employees, the court stated, "[w]hen churches expand their operations beyond the traditional functions essential to the propagation of their doctrine, those employed to perform tasks which are not traditionally ecclesiastical or religious are not 'ministers' of a 'church' entitled to *McClure*-type protection." *Id.* Accordingly, the court found that "administrators whose function re-late[d] exclusively to the Seminary's finance, maintenance, and other non-academic departments . . . are not ministers" under the Ministerial Exception. *Id.*

Here, as with the faculty members in *Southwestern Baptist*, Plaintiff Bryce was hired based on religious criteria. St. Aidan's Youth Proposal required that the Youth Minister have a belief in Jesus Christ and an ability to share that belief with youth. The Proposal emphasized that having a strong youth ministry was central to the church's mission. Building a strong youth ministry required a Youth Minister who could direct a program that would claim Jesus as Lord but would also incorporate fellowship, education, service and worship. While the position also required administrative and planning skills, the primary emphasis was on religious criteria. Just as in *Southwestern Baptist*, this criteria was more important than the Youth Minister's devotion to the Episcopal Church. Plaintiff Bryce was hired not just for her administrative capabilities, but because of her evident relationship with Jesus Christ and her apparent calling to work with children.

Plaintiff Bryce's position, unlike the administrative positions in *Southwestern Baptist*, is a traditional function necessary to the propagation of the church. St. Aidan's viewed the youth ministry as essential to maintaining a healthy parish and fulfilling biblical commandments. Unlike the finance and maintenance functions in *Southwestern Baptist*, Plaintiff Bryce worked in a capacity to attract children to

St. Aidan's and to introduce them to the church and its activities. St. Aidan's used these activities to help retain families as members of the parish.

In *Rayburn*, the court found the position of an associate in pastoral care was "so significant in the expression and realization of Seventh-day Adventist beliefs that state intervention in the appointment process would excessively inhibit religious liberty." 772 F.2d at 1168. The court stated that an associate in pastoral care acted as an advisor to a school that introduced children to the life of the church, lead small congregational groups in Bible study, and acted as a liaison between the church as an institution and those whom it would touch with its message. *Id.* This position also required occasional preaching. *Id.* The court stated "[a]ny one of these functions so embodies the basic purpose of the religious institution that state scrutiny of the process for filling the position would raise constitutional problems." *Id.*

Like *Rayburn*, Plaintiff Bryce acted as a significant figure in furthering the expression and realization of the beliefs held by St. Aidan's. Specifically, Plaintiff Bryce acted to build a cohesive youth group; such action was the desired result of the Youth Minister Proposal which envisioned a strong youth ministry that would help St. Aidan's attain other parish objectives. In *Rayburn*, the plaintiff acted as an advisor to a school that introduced children to the life of the church. Here, Plaintiff Bryce was more than an advisor, she was the very one introducing children to the church and its activities. As in *Rayburn*, Plaintiff Bryce acted as a liaison between the church and the children it sought to reach. As stated in the Youth Minister Proposal, building a strong youth ministry was essential to the church's purpose of attracting people to the parish. Unlike *Rayburn*, Plaintiff was not required to preach or lead Bible studies. However, these differences are insufficient to distinguish the *Rayburn* case, as that court stated that any one of the listed functions

was sufficient to prohibit scrutiny by the court.

The *Catholic University* court addressed whether a nun qualified as a minister under the *Rayburn* test. 83 F.3d at 463. There, the plaintiff argued that she was not a minister because she was not ordained and that her duties were not pervasively religious. *Id.* The court found the plaintiff's non-ordination immaterial as the Ministerial Exception encompasses all employees of a religious institution whose primary functions serve its spiritual and pastoral mission. *Id.* The court found that the role performed by the faculty is vital to the spiritual and pastoral mission of the Catholic Church. *Id.* at 464. The court also found that her duties were pervasively religious. *Id.* Plaintiff was a member of a faculty whose stated mission was to foster and teach sacred doctrine. *Id.*

Here, as with the faculty in *Catholic University,* the position which Plaintiff Bryce filled was vital to the spiritual and pastoral mission of the church. Like the plaintiff in *Catholic University,* Plaintiff Bryce claims that her duties at St. Aidan's were not pervasively religious. Plaintiff points to the activities she conducted, including a march for hunger, lock-ins, movie nights, miniature golf, and other recreational and service activities, and claims that these were purely secular. In doing so, Plaintiff overlooks her own statements. Plaintiff stated that she looked forward to ministering to youth in the Boulder area and that she had, in fact, ministered to the youth. Plaintiff Bryce admits that her activities with the youth included talking about God, and occasionally offering a prayer before meals or at the end of meeting. Before starting as Youth Minister, Plaintiff Bryce agreed to encourage the youth and their families to attend upcoming retreats and conventions. As Youth Minister, Plaintiff Bryce lead the youth in the "Festival of Lessons and Carols" where the youth read scripture. She also initiated a "Youth Sunday" where the youth participated in various aspects of the service. Furthermore, Plaintiff Bryce led the youth in a mission trip to Navaholand where they represented the parish and the Lord. Plaintiff Bryce also began incorporating the youth's activities with the regularly scheduled parish meetings so the youth could attend Eucharist with the rest of the parish. Plaintiff Bryce led the youth to other worship services in order to learn how other congregations worshiped.

█ Even when viewed in a light most favorable to the Plaintiff, the undisputed facts reveal that Plaintiff Bryce's activities while employed at St. Aidan's served a traditionally religious function necessary to fulfill the church's spiritual and pastoral mission. Plaintiff's statements and activities lead the Court to conclude that Plaintiff Bryce's duties as Youth Minister were pervasively religious. Although Plaintiff Bryce planned and organized many activities which were secular in nature, these activities were aimed at achieving a spiritual purpose. Plaintiff Bryce's activities fulfilled St. Aidan's desire to build a healthy youth ministry that would help the church attract and retain families to the parish. Therefore the Court finds that Plaintiff Bryce functioned as a minister as that term is used in the context of the Ministerial Exception. Accordingly, Plaintiff Bryce's Title VII sexual harassment claims are barred by the Ministerial Exception.

The Court's decision is supported by several policy justifications. "The right to choose ministers without government restriction underlies the well-being of religious community for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large." *Rayburn,* 772 F.2d at 1167. "No member of a church may claim, under the First Amendment, an enforceable right to be considered or accepted by the church hierarchy as a minister." *Id.* at 1168 n. 5. "Any attempt by government to restrict a church's free choice of its leaders thus constitutes a burden on the church's free exercise rights." *Id.* That

Plaintiff Bryce was chosen by St. Aidan's to lead its youth ministry, there can be no doubt. It would surely violate the principles of the First Amendment for this Court to dictate to St. Aidan's a decision regarding the employment of a Youth Minister whose purpose was to lead its children in an effort to reach out to those children and their parents.

Plaintiff Bryce raises arguments which challenge the Courts conclusion on both factual and legal grounds. Factually, she argues that she did not function as a minister while employed at St. Aidan's. She claims that her primary duties at St. Aidan's were secular in nature, albeit performed in a religious context. However, Plaintiff's arguments ignore the purpose of the position which she filled at St. Aidan's. As Youth Minister, Plaintiff Bryce attracted youth to the church and built a youth ministry designed to aid the church in accomplishing other religious objectives. Therefore, while Plaintiff's duties may have included secular activities, they were conducted to achieve spiritual goals.

As a legal challenge, Plaintiff Bryce attempts to create a distinction between Title VII cases involving termination of a minister and those involving sexual harassment. She cites *Bollard v. California Province of the Soc'y of Jesus* 196 F.3d 940 (9th Cir.1999) for the proposition that a court may hear a claim of sexual harassment, even if the plaintiff is a minister. In *Bollard*, a panel of the Ninth Circuit found the Ministerial Exception inapplicable to a Jesuit novice's Title VII sexual harassment claim because the Jesuit Order was "neither exercising its constitutionally protected prerogative to choose its ministers nor embracing the behavior at issue as a constitutionally protected religious practice." 196 F.3d at 944.

*Bollard* is distinguishable from this case. Here, Defendants were acting to determine whether Plaintiff Bryce would continue to act as its Youth Minister. Therefore Defendants were exercising its constitutionally protected ability to choose its minister. *See Kedroff,* 344 U.S. at 107–08, 73

S.Ct. 143. Also, by sending letters and holding meetings, Defendants were exercising their ecclesiastical authority to decide a "controverted question of religious doctrine." *Watson,* 80 U.S. at 728–29.

## B. Plaintiff Bryce's §§ 1985 and 1986 Claims

Plaintiff Bryce also brings claims under 42 U.S.C. §§ 1985 and 1986 alleging that Defendants acted collectively to subject Plaintiff to writings and meetings which described her purported sexual relations in a harassing manner. She claims that Defendants' actions were taken to terminate her employment at St. Aidan's and to deprive her of various constitutional rights.

The rationale of the Supreme Court in preventing judicial review of religious disputes, embodied in the Ministerial Exception, has been applied to areas other than Title VII. *See Powell,* 859 F.Supp. 1343 (holding that the ADEA's application would violate the First Amendment). In dicta, the Ninth Circuit Court of Appeals suggested that since the Ministerial Exception to Title VII is based on the First Amendment, there must also be a Ministerial Exception to any cause of action which would impinge a church's ability to select its ministers or to exercise its religious beliefs in the context of employing its ministers. *Bollard,* 196 F.3d at 950; *see also Natal v. Christian and Missionary Alliance,* 878 F.2d 1575 (1st Cir.1989) (barring minister's claims for wrongful termination); *Scharon v. St. Luke's Episcopal Presbyterian Hosp.,* 929 F.2d 360, 362 (8th Cir.1991) (holding that the First Amendment forecloses the application of Title VII and the ADEA to an employment decision by a church-affiliated hospital concerning a chaplain-employee); *Minker v. Baltimore Annual Conference of the United Methodist Church,* 894 F.2d 1354, 1358 (D.C.Cir. 1990) (adjudication of minister's ADEA claim against his church would violate the Free Exercise Clause).

This Court agrees that the rationale of the Ministerial Exception is not limited to

Title VII civil rights claims but also applies to other civil rights claims brought by a minister. Plaintiff Bryce's claims under §§ 1985 and 1986 relate to her status as an employee of St. Aidan's. Because the First Amendment prevents the Court from hearing disputes between a church and its ministers, any claims arising from events surrounding Plaintiff's termination are also barred by the First Amendment. *See Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 494 (5th Cir.1974) (42 U.S.C. §§ 1985 and 1986 claims arising from a church's ouster of a minister against various church defendants dismissed for lack of subject matter jurisdiction based on the principle of the *Watson* line of cases that civil courts are not an appropriate forum for review of ecclesiastical decisions).

In an unrelated section of their brief, Plaintiffs cite *Guinn v. Church of Christ*, 775 P.2d 766 (Okla.1989) where the court allowed a former member of the congregation to sue in tort the elders of a church. There the court made a distinction between the actions taken by the elders while the plaintiff was a member of the church and those taken after she revoked her membership. *Guinn*, 775 P.2d at 775. Those actions that occurred before she revoked her membership were shielded by the barriers of the First Amendment. *Id.* The *Guinn* court recognized the importance of the plaintiff's voluntary association with the church whereby she voluntarily consented to the elder's governance. *Id.* (citing *Watson*, 80 U.S. at 728–29, 80 U.S. 679). As in *Guinn*, Plaintiff Bryce was still voluntarily associated with St. Aidan's; she was still employed with St. Aidan's and was attempting to retain her position. All of the activities about which Plaintiff complains took place while Plaintiff Bryce was still voluntarily associated with St. Aidan's. In fact, Plaintiff Bryce remained employed with St. Aidan's until June 1999. Therefore the disputed actions taken by Defendants are within the purview of Defendants' governing powers secured by the First Amendment. *See Watson*, 80 U.S. at 728–29.

**C. Plaintiff Smith's §§ 1985 and 1986 claims**

Plaintiff Smith brings claims under 42 U.S.C. §§ 1985 and 1986 alleging that Defendants acted collectively to subject her to writings and meetings which described her purported sexual relations in a harassing manner. In particular, Plaintiff Smith complains that Defendants published harassing and damaging materials about Plaintiffs and discussed Plaintiffs' relationship in front of the parish.

This Court reiterates the theme of the Supreme Court's view that the First Amendment severely limits a court's role in resolving religious disputes. The courts have essentially no role in determining ecclesiastical questions, or religious doctrine and practice. *Presbyterian Church*, 393 U.S. at 449, 89 S.Ct. 601. The First Amendment ensures the right of religious tribunals to settle disputes arising among the parish and to govern the "individual members, congregations, and officers within the general association." *Watson*, 80 U.S. at 729. "The relationship between an organized church and its ministers is its lifeblood." *McClure*, 460 F.2d at 558. Therefore, matters concerning this relationship are solely of ecclesiastical concern. *Id.* at 559.

However, the Court is also aware of the limits of a church's ability to act upon *its* beliefs. "[T]he [First] Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." *Cantwell v. State of Connecticut*, 310 U.S. 296, 303–04, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

The Court recognizes the fact that Plaintiff Smith was not affiliated with St. Aidan's or the Diocese. Despite this fact, Plaintiff Smith voluntarily appeared at the parish meetings. Aside from these parish meetings, the Court finds no reference to Plaintiff Smith in any of Defendants' communications. Even when viewed in a light most favorable to the Plaintiff, the materials submitted by the parties shows that

**1344**

Defendants' communications were addressing a dispute involving its minister, Plaintiff Bryce.

Plaintiff Smith cites *General Council on Finance and Admin. of United Methodist Church v. Superior Court of California,* 439 U.S. 1355, 1373, 99 S.Ct. 35, 58 L.Ed.2d 63 (1978) for the proposition that churches may not injure third parties and escape liability by hiding behind the shield of the First Amendment. However, in that case, the Supreme Court stated that "[First Amendment] considerations are not applicable to *purely secular* disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract, and statutory violations are alleged." *General Council on Finance,* 439 U.S. at 1373, 99 S.Ct. 35 (emphasis added). The dispute at issue in this case does not involve a purely secular controversy. Here, the dispute involved a church's selection of its minister and a resolution of a controverted question of faith. Therefore this Court finds the Supreme Court's admonition in *General Council on Finance* inapplicable.

Plaintiff also analogizes her case to that in *Guinn,* 775 P.2d 766. In particular, Plaintiff contends that, as in *Guinn,* she was also non member who had not consented to the church's authority. However, in *Guinn,* the court held that "an unwilling, nonconsenting subject of a church's disciplinary actions has an actionable claim against the Elders." *Guinn,* 775 P.2d at 783. Here, Plaintiff Smith voluntarily appeared at the parish meetings. In addition, she was not being disciplined by the church, nor was the church's actions directed toward her. Rather, the church's actions were addressing a matter of internal dispute.

In order for this Court to hear Plaintiff Smith's claims, it would necessarily have to examine those actions taken by Defendants which this Court has already found to be protected by the First Amendment. This Court's review of the actions about which Plaintiff Smith complains would re-

quire an impermissible interference with St. Aidan's religious liberties. The First Amendment bars this Court from addressing events such as this which are the basic exercise of a religious tribunals attempt to decide and settle "controverted questions of faith." *Watson,* 80 U.S. at 729.

Accordingly, the Court finds that the First Amendment of the United States Constitution bars Plaintiff Smith's claims under 42 U.S.C. §§ 1985 and 1986.

### Conclusion

For the foregoing reasons, the Court **ORDERS** that Defendants' motion to dismiss for lack of subject matter jurisdiction which was converted to a motion for summary judgment is hereby **GRANTED**. Plaintiffs' claims are **DISMISSED WITH PREJUDICE**. Each party to bear its own costs.